**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRADLEY BOARDMAN, a Washington Individual Provider; DEBORAH THURBER, a Washington Family Childcare Provider; SHANNON BENN, a Washington Family Childcare Provider; FREEDOM FOUNDATION, a Washington nonprofit organization, *Plaintiffs-Appellants*, <br><br> v. <br><br> JAY ROBERT INSLEE, Governor of the State of Washington; ROBERT HINES[*], Director of the Washington Department of Social and Health Services (DSHS); ROSS HUNTER, Secretary of the Washington | No. 19-35113 <br><br> D.C. No. 3:17-cv-05255-BHS <br><br><br> OPINION |

---

[*] Robert Hines is substituted for his predecessor, Patricia Lashway, as the Director of the Washington Department of Social and Health Services ("DSHS"). Fed. R. App. P. 43(c)(2).

Department of Children, Youth, and
Families (DCYF)[**],
                              *Defendants-Appellees*,

CAMPAIGN TO PREVENT FRAUD AND
PROTECT SENIORS,
        *Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted February 4, 2020
Seattle, Washington

Filed October 22, 2020

Before:  Milan D. Smith, Jr., N. Randy Smith, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge N.R. Smith;
Dissent by Judge Bress

---

[**] On July 6, 2017, the Washington Department of Early Learning
("DEL") ceased to exist as an independent state agency and its functions
were transferred to the newly formed Washington Department of Children,
Youth, and Families ("DCYF"). *See* Act of July 6, 2017, 2017 Wash.
Laws ch. 6, § 802(1) ("The [DEL] is hereby abolished and its powers,
duties, and functions are hereby transferred to the [DCYF]."). Thus, the
DCYF has been substituted for the DEL in this appeal.

# SUMMARY[**]

## Civil Rights

The panel affirmed the district court's summary judgment in favor of Washington state defendants in an action brought pursuant to 42 U.S.C. § 1983 challenging the constitutionality of ballot initiative 1501, passed by Washington voters, which prohibits public access to certain government-controlled information, including the personal information of in-home care providers, but permits that information to be disclosed to the providers' certified exclusive bargaining representatives.

Plaintiffs-Appellants are a nonprofit organization and individual in-home providers who are required by Washington law to participate in statewide collective bargaining. Although the individual Appellants are members of their collective bargaining units, they are not members of their respective unions and do not pay agency or "fair share" fees—fees paid to a union by nonmembers to support activities that are germane to a union's duties as a collective-bargaining representative. Appellants seek to inform other individual in-home providers of their right to opt out of paying agency fees to their unions. After the passage of Initiative 1501, however, Appellants were unable to obtain the contact information of other in-home providers. Appellants allege that Part III of Initiative 1501 violates the First Amendment by discriminating among viewpoints and impairing their freedom of association. Additionally, they allege that the initiative transgresses the Equal Protection

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Clause of the Fourteenth Amendment, because it burdens their fundamental rights and is motivated by animus.

Citing *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality opinion), the panel first acknowledged the well-settled principle that the First Amendment does not guarantee a general right of access to government information or sources of information within the government's control. The panel further stated that although the decision whether to disclose government-controlled information is generally a task which the Constitution has left to the political processes, the First Amendment forbids a state from discriminating invidiously among viewpoints in the provision of information within its control. However, a state does not engage in viewpoint discrimination by simply disclosing the personal information of public or quasi-public employees to the employees' certified exclusive collective bargaining representative, while denying equal access to the public. The panel concluded that Initiative 1501 did not impose viewpoint-based conditions on the disclosure of provider information, did not discriminate between the competing views of Appellants and their Service Employee Unions, and did not implicate the individual Appellants' associational freedom.

The panel rejected Appellants' claim that Initiative 1501 violates the First Amendment rights of other in-home care providers by denying the providers the right to determine for themselves if they want to hear plaintiffs' messages. The panel held that Appellants did not have standing to assert the rights of other in-home care providers.

Finally, the panel rejected Appellants' claim that Initiative 1501 violated the Equal Protection Clause. The

panel concluded that the challenged provisions of Initiative 1501 satisfied rational-basis review. The panel stated that the State has a legitimate interest in protecting seniors and other vulnerable individuals—and all of its residents, for that matter—from identity theft and other financial crimes, and Washington voters could have rationally decided that generally prohibiting public access to the personal information of in-home care providers—many of whom work within the homes of their clients—would further that interest. The panel further rejected Appellants' contention that Initiative 1501 was motivated by animus. The panel stated that here was no evidence in the record indicating that the more than 2.2 million Washington voters who voted in favor of Initiative 1501 were motivated by an irrational prejudice, or a bare desire to harm Appellants or their message against the Unions.

Dissenting, Judge Bress stated that the text and operation of I-1501 and a troubling documentary record demonstrate exactly what was going on here: transparent viewpoint discrimination. The State was effectively using an information embargo to promote the inherently "pro-union" views of the incumbent unions, while making it vastly more difficult for those with opposing views—and particularly those with views opposite unions—to reach their intended audience. Judge Bress would hold that I-1501 fails First Amendment scrutiny.

## COUNSEL

Susan K. Stahlfeld (argued), Miller Nash Graham & Dunn LLP, Seattle, Washington; Caleb Jon F. Vandenbos, Freedom Foundation, Olympia, Washington; for Plaintiffs-Appellants.

Peter B. Gonick (argued) and Callie A. Castillo, Deputy
Solicitors General; Robert W. Ferguson, Attorney General,
Office of the Attorney General, Olympia, Washington; for
Defendants-Appellees.

Gregory J. Wong (argued), Paul J. Lawrence, and Claire E.
McNamara, Pacifica Law Group LLP, Seattle, Washington,
for Intervenor-Defendant-Appellee.

## OPINION

N.R. SMITH, Circuit Judge:

Although the decision whether to disclose government-
controlled information is generally a "task which the
Constitution has left to the political processes," *Houchins v.
KQED, Inc.*, 438 U.S. 1, 12 (1978) (plurality opinion), the
First Amendment forbids a state from discriminating
invidiously among viewpoints in the provision of information
within its control. However, a state does not engage in
viewpoint discrimination by simply disclosing the personal
information of public or quasi-public employees to the
employees' exclusive collective bargaining representative,
while denying equal access to the public. *See Perry Educ.
Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49
(1983).

Initiative 1501, a ballot initiative passed by Washington
voters, prohibits public access to certain government-
controlled information, including the personal information of
in-home care providers. Under the initiative, in-home care
providers' personal information must still be disclosed to
their exclusive bargaining representatives. Appellants, who

have been denied access to this information, challenge Initiative 1501 under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The district court rejected Appellants' claims on summary judgment. So do we.

**I**

In this opinion, we are concerned only with the constitutionality of Initiative 1501. However, in order to address that issue, we must begin our analysis a few years prior to the initiative's passage.

**A**

Appellants, Bradley Boardman, Deborah Thurber, and Shannon Benn, provide home-based care services in the State of Washington. Boardman is an "individual provider" who provides Medicaid-funded healthcare services for a disabled family member. *See* Wash. Rev. Code § 74.39A.240(3) ("'Individual provider' means a person . . . who, under an individual provider contract with the department [of social and health services] or as an employee of a consumer directed employer, provides personal care or respite care services to persons who are functionally disabled or otherwise eligible under [various Medicaid- or state-funded programs]."). Thurber and Benn are "family child care providers" who provide state-subsidized childcare services for low-income families. *See id.* § 41.56.030(7) ("'Family child care provider' means a person who: (a) Provides regularly scheduled care for a child or children in the home of the provider or in the home of the child or children for periods of less than twenty-four hours or, if necessary due to the nature of the parent's work, for periods equal to or greater than twenty-four

hours; (b) receives child care subsidies; and (c) . . . is either licensed by the state or is exempt from licensing.").

As in-home care providers, Appellants are required by Washington law to participate in statewide collective bargaining. *Id.* §§ 41.56.028, 74.39A.270. Individual providers and family child care providers compose two separate collective bargaining units, each of which is represented by an exclusive bargaining representative elected by a majority of providers within the unit. *Id.* §§ 41.56.028(2), 74.39A.270(2)(a), (7). Currently, Service Employees International Union Healthcare 775NW ("SEIU 775") represents individual providers, and Service Employees International Union Local 925 ("SEIU 925") represents family child care providers (collectively, the "Unions"). As the exclusive bargaining representatives of in-home care providers, the Unions must represent all the providers within each of their collective bargaining units without regard to union membership. *Id.* § 41.56.080.

Although they are members of their collective bargaining units, Boardman, Thurber, and Benn are not members of the Unions. They do not pay agency or "fair share" fees—fees paid to a union by nonmembers to support "activities that are 'germane to the union's duties as collective-bargaining representative,'" *see Janus v. Am. Fed'n of State, Cty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2460 (2018) (alteration adopted) (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235 (1977), *overruled by Janus*, 138 S. Ct. at 2486), nor do they otherwise support the Unions' collective bargaining efforts on their behalf. In fact, Thurber and Benn serve on the board of directors of Pacific Northwest Family Child Care Association ("PNFCCA"), a rival union of SEIU 925. With the help of Appellant Freedom Foundation (a

§ 501(c)(3) non-profit organization), Thurber and Benn have campaigned for several years to replace SEIU 925 with PNFCCA as the exclusive bargaining representative for family child care providers. To do so, PNFCCA must first obtain 30% support among family child care providers to force an election, a milestone they have yet to achieve. *See* Wash. Rev. Code § 41.56.070. The Freedom Foundation has also assisted Boardman in his efforts to inform other individual providers of their right to opt out of paying agency fees to SEIU 775.[1]

To promote their various causes, Appellants have had to obtain the contact information of in-home care providers. This has not been a simple task. More than 40,000 providers work in homes dispersed throughout Washington. They do not share workplaces, supervisors, or clients, and they have a notably high turnover rate. Consequently, to collect in-home care providers' contact information, Appellants have relied largely on Washington's Public Records Act ("PRA"), which requires state agencies to "make available for public inspection and copying all public records," unless a specific exemption applies. *Id.* § 42.56.070(1); *see also Doe ex rel. Roe v. Wash. State Patrol*, 374 P.3d 63, 67 (Wash. 2016) ("Despite the PRA's presumption of openness and transparency, the legislature has made certain public records exempt from production."). Through PRA requests, Appellants have obtained lists of in-home care providers' personal information that had been maintained in the custody

---

[1] In *Harris v. Quinn*, 573 U.S. 616 (2014), the Supreme Court held that, under the First Amendment, quasi-public employees (like in-home care providers in the State of Washington) could not be compelled to pay agency fees to a union representative who they "do not want to join or support." *Id.* at 656.

of the Department of Social and Health Services ("DSHS") and the Department of Early Learning ("DEL") (now the Department of Children, Youth, and Families ("DCYF"))—the state agencies that administer home-care programs. *See* Wash. Rev. Code § 74.39A.240; *Serv. Emps. Int'l Union Local 925 v. Dep't of Early Learning*, 450 P.3d 1181, 1182 (Wash. 2019). With this information, Appellants were able to identify in-home care providers and contact them through the mail and by door-to-door canvassing, which proved to be a relatively efficient way of spreading their messages and voicing their opposition to the Unions.

Naturally, the Unions opposed Appellants' efforts to replace SEIU 925 with a rival union and to otherwise diminish the Unions' support among in-home care providers. In 2014, the Unions began challenging Appellants' PRA requests in state court, seeking to enjoin disclosures of DSHS's and DEL's lists of in-home care providers' information. For a time, Appellants were successful in obtaining in-home care providers' information, despite the litigation spawned by their PRA requests. But due to in-home care providers' high turnover, these lists soon became outdated. Therefore, Appellants continued to request updated lists from DSHS and DEL to facilitate in spreading their messages among a wide audience of in-home care providers.

**B**

In November 2016, Washington voters passed Initiative 1501, a ballot initiative designed to "protect the safety and security of seniors and vulnerable individuals" (e.g., the elderly and individuals with developmental disabilities, *see* Wash. Rev. Code § 9.35.005(7)) from various financial crimes. Seniors and Vulnerable Individuals' Safety and

Financial Crimes Prevention Act, 2017 Wash. Legis. Serv., ch. 4, I.M. No. 1501, § 2 (West). Initiative 1501 was comprised of three parts. Part I amended the definition of first-degree identity theft under Washington's criminal code to include "knowingly target[ing] a senior or vulnerable individual in" committing an identity crime. *Id.* § 6 (codified at Wash. Rev. Code § 9.35.020(2)). Part II enacted a treble-damages provision applicable in any civil cause of action in which the plaintiff "was victim to consumer fraud that targeted him or her as a senior or vulnerable individual." *Id.* (codified at Wash. Rev. Code § 9.35.060).

Part III of Initiative 1501—which forms the basis of this dispute—exempted a new category of public records from disclosure under the PRA. It provided:

> To protect vulnerable individuals and their children from identity crimes and other forms of victimization, *neither the state nor any of its agencies shall release sensitive personal information of vulnerable individuals or sensitive personal information of in-home caregivers for vulnerable populations*, as those terms are defined in [Revised Code of Washington section 42.56.640].

*Id.* § 10 (codified at Wash. Rev. Code. § 43.17.410) (emphasis added). Additionally, Part III directly amended the PRA to exempt the sensitive personal information of vulnerable individuals and their in-home care providers from "inspection and copying under [the PRA]." *Id.* § 8 (codified at Wash. Rev. Code § 42.56.640(1)). "Sensitive personal information" was defined to cover an individual's name, addresses, contact information, and "other personally

identifying information." *Id.* (codified at Wash. Rev. Code § 42.56.640(2)(b)).

With the passage of Initiative 1501, the sensitive personal information of vulnerable individuals and in-home care providers joined hundreds of other categories of public records that have been exempted from disclosure under the PRA. "The general purpose of the exemptions to the [PRA's] broad mandate of disclosure is to exempt from public inspection those categories of public records most capable of causing substantial damage to the privacy rights of citizens or damage to vital functions of government." *Limstrom v. Ladenburg*, 963 P.2d 869, 875 (Wash. 1998). "There are three sources of PRA exemptions: (1) enumerated exemptions contained in the PRA itself, (2) any 'other statute' that exempts or prohibits disclosure . . . , and (3) the Washington Constitution." *SEIU 775 v. State Dep't of Soc. & Health Servs.*, 396 P.3d 369, 372 (Wash. Ct. App. 2017) (quoting Wash. Rev. Code § 42.56.070(1)). These exemptions cover a wide range of information, from certain law enforcement and crime data, public employees' personal information, and proprietary records, *see, e.g.*, Wash Rev. Code §§ 42.56.240, 42.56.250, 42.56.270, to library records, *id.* § 42.56.310, commercial fishing catch and shellfish harvest data, *id.* § 42.56.430(1), (8), and maps of archaeological sites, *id.* § 42.56.300(1).

Initiative 1501's prohibition on public access to the personal information of vulnerable individuals and their in-home care providers was not without exceptions. The initiative authorized disclosure of information under several narrow circumstances, including when "disclosure is required by federal law" or "by a contract between the state and a third party," or when "[t]he information is being released

as part of a judicial or quasi-judicial proceeding."[2]

---

[2] Part III of Initiative 1501 provided:

Nothing . . . shall prevent the release of public information in the following circumstances:

(a) the information is released to a governmental body, including the state's area agencies on aging, and the recipient agrees to protect the confidentiality of the information;

(b) the information concerns individuals who have been accused of or disciplined for abuse, neglect, exploitation, abandonment, or other acts involving the victimization of individuals or other professional misconduct;

(c) the information is being released as part of a judicial or quasi-judicial proceeding and subject to a court's order protecting the confidentiality of the information and allowing it to be used solely in that proceeding;

(d) the information is being provided to a representative certified or recognized under RCW 41.56.080, or as necessary for the provision of fringe benefits to public employees, and the recipient agrees to protect the confidentiality of the information;

(e) the disclosure is required by federal law;

(f) the disclosure is required by a contract between the state and a third party, and the recipient agrees to protect the confidentiality of the information;

(g) the information is released to a person or entity under contract with the state to manage, administer, or provide services to vulnerable

Seniors and Vulnerable Individuals' Safety and Financial Crimes Prevention Act, 2017 Wash. Legis. Serv., ch. 4, I.M. No. 1501, § 11(c), (e), (f) (West) (codified at Wash. Rev. Code § 42.56.645(1)(c), (e), (f)). Information could also be lawfully disclosed if it were "being provided to a representative certified or recognized under [Wash. Rev. Code section] 41.56.080," *id.* § 11(d) (codified at Wash. Rev. Code § 42.56.645(1)(d)), which is an exclusive bargaining representative of a collective bargaining unit, Wash. Rev. Code § 41.56.080 ("The bargaining representative which has been determined to represent a majority of the employees in a bargaining unit shall be certified by the commission as the exclusive bargaining representative of, and shall be required to represent, all the public employees within the unit without regard to membership in said bargaining representative . . . .").[3]

---

residents, or under contract with the state to engage in research or analysis about state services for vulnerable residents, and the recipient agrees to protect the confidentiality of the information; or

(h) information about specific public employee(s) is released to a bona fide news organization that requests such information to conduct an investigation into, or report upon, the actions of such specific public employee(s).

Seniors and Vulnerable Individuals' Safety and Financial Crimes Prevention Act, 2017 Wash. Legis. Serv., ch. 4, I.M. No. 1501, § 11 (codified at Wash. Rev. Code § 42.56.645(1)).

[3]   The Unions have had the ability to obtain access to Provider Information under this exception, because they are both currently "representative[s] certified or recognized under [Wash. Rev. Code section] 41.56.080." *See* Wash. Rev. Code § 42.56.645(1)(d).

Boardman, Thurber, and the Freedom Foundation were active in their opposition to Initiative 1501. Together, they prepared the "Argument Against" statement for the initiative in the "Voter's Guide" to the 2016 election. In their statement, they alleged that the Unions drafted and supported Initiative 1501 "to prevent in-home caregivers and childcare providers from learning they no longer can be forced to pay dues to the union" and to "protect[] union bosses' wallets." "If Initiative 1501 passes," they claimed, "caregivers will not even be able to contact each other to discuss issues of common concern." The "Argument For" statement was prepared by two in-home care providers, an elder advocate, the King County Sheriff, and a representative of the Puget Sound Advocates for Retirement Action. They argued that Initiative 1501 would help prevent "fraudulent telemarketers" and "identity thieves" from "targeting seniors and the vulnerable."

The chief proponent of Initiative 1501 was the "Campaign to Prevent Fraud and Protect Seniors" ("Campaign"), a campaign committee registered with the State of Washington to "spearhead[] the campaign" in favor of the initiative. The Campaign was composed of "unions, advocates for seniors, public safety officials, and community groups." Its literature was unequivocal in its support for Initiative 1501: "Groups like the Freedom Foundation are threatening unions. . . . Initiative 1501 will keep groups like the Freedom Foundation from getting our personal information. Vote yes on I-1501 to keep our unions strong and protect what we've fought for." The Campaign received substantial contributions from the Unions. It was also chaired by SEIU 775's secretary-treasurer. SEIU 775 echoed the Campaign's support for Initiative 1501 in an email to its members: "There's one more way you can fight to stop the Freedom Foundation: When you

get your ballot in the mail, vote YES on I-1501, which protects the private information of caregivers and our state's most vulnerable."

In the final tally, nearly 71% of Washington voters supported the passage of Initiative 1501. The initiative took effect on December 8, 2016.

## C

After Initiative 1501 took effect, Boardman, Thurber, and Benn made PRA requests to DSHS and DEL for updated lists of in-home care providers' personal information (hereafter, "Provider Information"). All of their requests were denied. Appellants then filed suit in federal district court seeking declaratory and injunctive relief under 42 U.S.C. § 1983.[4] Among other claims, Appellants alleged that Part III of Initiative 1501 violated the First Amendment by discriminating among viewpoints and impairing their freedom of association. Additionally, Appellants alleged that the initiative transgressed the Equal Protection Clause of the Fourteenth Amendment, because it burdened their fundamental rights and was motivated by animus. The Campaign intervened in the action to assist in defending the constitutionality of Initiative 1501. On cross-motions for summary judgment, the district court granted judgment in favor of the State and the Campaign on all of Appellants'

---

[4] When this suit was filed, Appellants named Jay Inslee, Governor of the State of Washington, Patricia Lashway, then-Director of DSHS, and Ross Hunter, then-Director of DEL, as defendants (collectively, the "State").

claims.[5] Appellants appealed the district court's judgment and renewed the foregoing claims.

## II

We have jurisdiction to review the district court's decision on cross-motions for summary judgment under 28 U.S.C. § 1291, and we review this decision de novo, *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011). "[W]e view the evidence in the light most favorable to the nonmoving party, determine whether there are any genuine issues of material fact, and decide whether the district court correctly applied the relevant substantive law." *Animal Legal Def. Fund v. U.S. Food and Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (per curiam). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III

Appellants primarily contend that, under the statutory provisions codifying Initiative 1501, they are denied access to Provider Information based on the views they espouse on the subject of collective bargaining. Before we address the merits of this claim, we must consider the State's threshold argument "that laws restricting public access to records do not implicate the First Amendment." On this score, the State argues that the disclosure of government-controlled information is "*wholly* within the legislative power," such

---

[5] Both the State and the Campaign are Appellees in this case. For ease of reference, we will refer only to the State when discussing the arguments raised by both parties in their joint answering brief.

that the decision to restrict access to Provider Information is beyond First Amendment scrutiny. The State urges us to reject Appellants' claim on this basis alone.

## A

*Houchins* first announced the well-settled principle that the First Amendment does not guarantee a general "right of access to government information or sources of information within the government's control." 438 U.S. at 15; *id.* at 16 (Stewart, J., concurring in the judgment) ("The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government . . . ."); *see also McBurney v. Young*, 569 U.S. 221, 232 (2013) ("[The Supreme] Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by [a state's freedom-of-information] laws.").**[6]** As Chief Justice Burger's opinion in *Houchins*

---

**[6]** Of course, we have recognized a qualified First Amendment right of access to certain government-controlled judicial records. We recently explained in *First Amendment Coalition of Arizona, Inc. v. Ryan*, 938 F.3d 1069 (9th Cir. 2019):

> As the Supreme Court originally conceptualized it, the First Amendment right of access to governmental proceedings refers to the right of the public to attend and observe those proceedings. In the initial cases recognizing the right, the Court held that the public has the right to attend criminal trials, the jury-selection process, and preliminary hearings. In situations in which other interests justify the closure of a proceeding, the Court held that the public has a right to access a transcript of the proceeding within a reasonable time. Our court has since extended the right of access to various documents filed in criminal proceedings. For

explains, the disclosure of government-controlled information is a "task which the Constitution has left to the political processes," such that "a legislative body might appropriately resolve one way or the other" whether to provide public access to information within its control. 438 U.S. at 12; *accord Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 934 (D.C. Cir. 2003) ("[D]isclosure of government information generally is left to the 'political forces' that govern a democratic republic." (quoting *Houchins*, 438 U.S. at 15)); *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1167 (3d Cir. 1986) (en banc) ("The founding fathers intended affirmative rights of access to government-held information, other than those expressly conferred by the Constitution, to depend upon political decisions made by the people and their elected representatives.").

---

example, we have held that the public has the right to access plea agreements, documents filed in pretrial proceedings, and documents filed in post-conviction proceedings.

*Id.* at 1078 (citations omitted); *see also Courthouse News Serv. v. Planet*, 947 F.3d 581, 585 (9th Cir. 2020) (deciding that "the press has a qualified [First Amendment] right of timely access to newly filed civil nonconfidential complaints"). "To determine whether a First Amendment right of access attaches to a type of judicial proceeding or record," we have applied the two-part test from *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (*Press–Enterprise II*), in which we consider: "(1) whether that proceeding or record 'has historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular governmental process in question.'" *Courthouse News Serv.*, 947 F.3d at 590 (alterations adopted) (quoting *Press-Enterprise II*, 478 U.S. at 8). In the district court, Appellants asserted a right of access to Provider Information under *Press Enterprise II*'s two-part test. The district court rejected that argument, and Appellants do not renew it on appeal.

Appellants acknowledge (as they must) that they have no First Amendment right of access to Provider Information and that Washington lawmakers have the political prerogative to "decide not to give out [this] information at all without violating the First Amendment." *See L.A. Police Dep't v. United Reporting Publ'g Corp.* (*United Reporting*), 528 U.S. 32, 40 (1999). However, Appellants argue that the First Amendment constrains the government's discretion to selectively disclose government-controlled information, namely, by forbidding the government from discriminating among viewpoints in the provision of information. Because the thrust of their claim is viewpoint discrimination, Appellants argue that they have presented us with a cognizable First Amendment claim.

After review of the relevant precedent, we disagree with the State. *Houchins* does not control here. Certainly, Appellants are without a general right of access to Provider Information under the First Amendment—this much they concede. But it is a separate question—and one that is not addressed in *Houchins*—whether the government may transgress the First Amendment by imposing viewpoint-based conditions on access to government-controlled information or by otherwise discriminating among viewpoints in the provision of information within its control. This is the gravamen of Appellants' claim, and *Houchins* does not resolve it.

The separate writings in *United Reporting* tease out this distinction. In *United Reporting*, the Supreme Court reviewed a California statute that imposed multiple conditions on public access to arrestee address information, including that the requester declare that the information would not be used "to sell a product or service." *Id.* at 34–35. The plaintiff (a

company that provided arrestees' personal information to its customers) brought a facial challenge to the statute under the First and Fourteenth Amendments. *Id.* at 34. The Supreme Court did not address whether the conditions on access to arrestee address information were constitutionally permissible, but held instead that the statute was not susceptible to a facial challenge. *Id.* at 40–41. The Court explained that "California could decide not to give out arrestee information at all without violating the First Amendment." *Id.* at 40 (citing *Houchins*, 438 U.S. at 14). Accordingly, "for purposes of facial invalidation," the California statute was "simply a law regulating access to information in the hands of the police department." *Id.*

Nonetheless, eight Justices in *United Reporting* joined three separate writings, all of which acknowledged the critical point that "restrictions on the disclosure of government-held information" may, under certain circumstances, "transgress the First Amendment." *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 569 (2011) (citing *United Reporting*, 528 U.S. at 41–42 (Scalia, J., joined by Thomas, J., concurring); *id.* at 42–44 (Ginsburg, J., joined by O'Connor, Souter, and Breyer, JJ., concurring); *id.* at 44–48 (Stevens, J., joined by Kennedy, J., dissenting)). Six justices specifically agreed that the government may not impose viewpoint-based conditions on the provision of government-controlled information without raising constitutional concerns. *See United Reporting*, 528 U.S. at 42–44 (Ginsburg, J., concurring); *id.* at 44–48 (Stevens, J., dissenting).

In her concurrence, Justice Ginsburg (joined by Justices O'Connor, Souter, and Breyer) agreed with the opinion of the Court that "California could . . . constitutionally decide not to give out arrestee address information at all." *Id.* at 43

(Ginsburg, J., concurring). However, she compared the government's "provision of address information [to] a kind of subsidy to people who wish to speak to or about arrestees." *Id.* (Ginsburg, J., concurring). As such, "once a State decides to make such a benefit available to the public, there are no doubt limits to its freedom to decide how that benefit will be distributed." *Id.* (Ginsburg, J., concurring). For example, "California could not . . . release address information only to those whose political views were in line with the party in power," for surely a state "could not justify limited disclosures that discriminated on the basis of viewpoint or some other proscribed criterion." *Id.* at 43–44 (Ginsburg, J., concurring) (citing *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996)). But as long as "the award of the subsidy is not based on an illegitimate criterion such as viewpoint," a state "is free to support some speech without supporting other speech." *Id.* at 43 (Ginsburg, J., concurring) (citing *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540 (1983)).

In dissent, Justice Stevens (joined by Justice Kennedy) reiterated the rule that California was free to completely deny access to arrestee address information without violating the First Amendment. *Id.* at 45 (Stevens, J., dissenting). He also thought "it equally clear that California could release the information on a selective basis to a limited group of users who have a special, and legitimate, need for the information." *Id.* (Stevens, J., dissenting). But he agreed with Justice Ginsburg that the authority to "withhold [government-controlled] information from all persons does not insulate [a state's] actions from constitutional scrutiny." *Id.* at 47 (Stevens, J., dissenting). "[W]hen the State makes information generally available, but denies access to a small disfavored class . . . based on their viewpoint, or political

affiliation, for example, the discrimination would clearly be invalid" and "obviously unconstitutional." *Id.* at 45–46 (Stevens, J., dissenting). "For even though government may withhold a particular benefit entirely, it 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech.'" *Id.* at 47–48 (Stevens, J., dissenting) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). In Justice Stevens's view, the California statute had denied access to the publishing company "based on the fact that [the company planned] to publish the information to others who, in turn, intended to use it for a commercial speech purpose that the State [found] objectionable." *Id.* at 46 (Stevens, J., dissenting). Accordingly, "because the State's discrimination [was] based on its desire to prevent the information from being used for constitutionally protected purposes," he would have required California to "justify[] its conduct." *Id.* (Stevens, J., dissenting).

Of course, we are not bound by the separate writings in *United Reporting*. Yet, we find the opinions of the six Justices expressed therein to be persuasive and are therefore disinclined to "blandly shrug them off" simply because they did not comprise the holding of the Court. *United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) (quoting *Zal v. Steppe*, 968 F.2d 924, 935 (9th Cir. 1992) (Noonan, J., concurring and dissenting)). These writings illustrate the limited scope of *Houchins*. Although the decision whether to disclose government-controlled information "at all" is well within the prerogatives of the political branches, *United Reporting*, 528 U.S. at 40; *see also Houchins*, 438 U.S. at 12, when the government selectively discloses information within its control, a First Amendment claim will lie if the government denies access to information

"based on an illegitimate criterion such as viewpoint," *United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring); *see also id.* at 45–47 (Stevens, J., dissenting). In the view of six Justices in *United Reporting*, a contrary conclusion would be irreconcilable with the constitutional precept that "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (alteration adopted and internal quotation marks omitted) (quoting *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006)); *see also Perry*, 408 U.S. at 597 ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests— especially, his interest in freedom of speech."). As in other areas where the legislature enjoys broad discretion in deciding whether and how to confer a benefit or subsidy, the government is not insulated from First Amendment scrutiny when it discriminates invidiously in the provision of government-controlled information. *See, e.g.*, *Agency for Int'l Dev.*, 570 U.S. at 221 (striking down a regulation because it "compel[led] as a condition of federal funding the affirmation of a belief that by its nature [could not] be confined within the scope of the Government program"); *Nat'l Endowment of the Arts v. Finley*, 524 U.S. 569, 587 (1998) ("If the [government] were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, . . . [or] if a subsidy were 'manipulated' to have a 'coercive effect,' then relief could be appropriate." (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 237

(1987) (Scalia, J., dissenting))); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) ("[A] tax scheme that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas." (citing *Regan*, 461 U.S. at 540)).

Two of our sister circuits have come to similar conclusions in finding that speaker-based or content-based restrictions on access to government-controlled information are "susceptible to a First Amendment challenge." *Fusaro v. Cogan*, 930 F.3d 241, 255 (4th Cir. 2019); *accord Lanphere & Urbaniak v. Colorado*, 21 F.3d 1508 (10th Cir. 1994). In *Fusaro*, the Fourth Circuit reviewed a Maryland statute that imposed two conditions on access to the state's voter-registration list: (1) the requester must be a registered Maryland voter; and (2) the information may only be used for purposes "related to the electoral process." *Id.* at 244. The plaintiff—a resident and registered voter of Virginia—was denied access to Maryland's voter-registration list. *Id.* at 245–46. He then challenged the Maryland statute in federal court, alleging that it burdened speech in violation of the First Amendment. *Id*. at 248. Relying on *Houchins*, the district court dismissed the plaintiff's complaint on the grounds that he had no First Amendment right of access to the voter-registration list. *Id.* The Fourth Circuit reversed. Unlike the district court, the court viewed the plaintiff's claim as "a free speech challenge to conditions that a state has imposed on the release of voter registration data," *id.* at 256, not a right-of-access claim (which would have been foreclosed by *Houchins*), *id.* at 249–50. Therefore, although "neither the Supreme Court in *Houchins* nor any appellate court applying that decision ha[d] been faced with a situation where the government provided information only to a discrete group for limited purposes," *id.* at 253, the court held that the plaintiff's

claim was "cognizable under the First Amendment," *id.* at 249. The court found that the separate writings in *United Reporting* "strongly signaled that . . . some conditions on the disclosure of government information can run afoul of the Free Speech Clause, giving rise to a viable constitutional claim." *Id.* at 253. Moreover, the court reasoned that restrictions based on the identity of a speaker or the content of a speaker's message like those imposed by the Maryland statute "are frequently deemed to be constitutionally suspect" in other contexts. *Id.* at 252. Accordingly, the court concluded that "a First Amendment claim that challenges suspect conditions on access to government information must be available, at least where the plaintiff alleges circumstances indicating improper interference with protected speech." *Id.* at 255.

In *Lanphere & Urbaniak*, the Tenth Circuit considered a First Amendment challenge to a Colorado statute that permitted "public access to criminal justice and official action records" only if the requester signed a statement affirming that the records would not be used "for the purpose of directly soliciting business for pecuniary gain." 21 F.3d at 1510–11. The plaintiffs argued that the Colorado statute imposed content-based conditions on access to government records by denying access to those who wished to use the records to engage in commercial speech, thus triggering First Amendment scrutiny. *Id.* at 1511. On the other hand, the defendants (like the State in this case) contended that the plaintiffs had brought "a simple access-to-records case" that did not raise any First Amendment issues. *Id.* The Tenth Circuit agreed that the plaintiffs had no First Amendment right of access to the government records under *Houchins*. *Id.* at 1511–12. But it disagreed that its inquiry ended there. *Id.* at 1512. Although Colorado had the authority to deny access

to the records entirely, it instead "disallow[ed] the release of records to those wishing to use them for commercial speech, while allowing the release of the same records to those having a noncommercial purpose." *Id.* at 1512–13. Because this regulatory scheme imposed "a content-based restriction on protected speech," the court concluded that the Colorado statute did "in fact implicate the First Amendment" and was subject to the appropriate level of scrutiny. *Id.* at 1513.

Here, Appellants challenge a law that regulates the disclosure of government-controlled information. Under *Houchins*, they have no First Amendment right of access to this information. 438 U.S. at 15. But like the plaintiffs in *Fusaro* and *Lanphere & Urbaniak*, Appellants do not rely on a right-of-access theory. Instead, Appellants argue that Washington law denies them access to Provider Information because of the views they express on a particular topic. The State's argument that "laws restricting public access to records do not implicate the First Amendment" relies on a misapplication of *Houchins*, which does not stand for the proposition that invidious viewpoint discrimination in the provision of government-controlled information is beyond constitutional scrutiny. We therefore agree with the Fourth Circuit and Tenth Circuit that "a First Amendment claim . . . must be available" in this context, *Fusaro*, 930 F.3d at 255; *accord Lanphere & Urbaniak*, 21 F.3d at 1512–13, lest the government be permitted to "discriminate invidiously . . . in such a way as to aim at the suppression of dangerous ideas," *Regan*, 461 U.S. at 548 (alteration adopted and internal quotations marks omitted) (quoting *Cammarano v. United States*, 358 U.S. 498, 513 (1959)). Accordingly, we turn to the merits of Appellants' claim.

**B**

Appellants articulate two discernable arguments in support of their claim that Revised Code of Washington sections 42.56.640 and 43.17.410—which codify Initiative 1501's prohibition on public access to the sensitive personal information of vulnerable individuals and their in-home care providers—deny them access to Provider Information based on the views they espouse on the subject of collective bargaining. Neither argument is supported by the text or operation of the challenged provisions.

Appellants first invoke what is known as the "unconstitutional conditions" doctrine by asserting that sections 42.56.640 and 43.17.410 condition receipt of a government benefit—Provider Information—on a requester's views, such that Appellants are denied access to Provider Information because they do not espouse "a State-preferred view" on collective bargaining. In the First Amendment context, this doctrine provides that "the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit," *Agency for Int'l Dev.*, 570 U.S. at 214 (alteration adopted and internal quotation marks omitted) (quoting *Rumsfeld*, 547 U.S. at 59). However, the challenged provisions do not operate as Appellants suggest, for they are completely "silent . . . concerning *any* speaker's point of view." *See Members of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (emphasis added). First, section 43.17.410 states:

> To protect vulnerable individuals and their children from identity crimes and other forms of victimization, neither the state nor any of

its agencies shall release sensitive personal information of vulnerable individuals or sensitive personal information of in-home caregivers for vulnerable populations, as those terms are defined in [Wash. Rev. Code section 42.56.640].

Second, section 42.56.640 provides: "Sensitive personal information of vulnerable individuals and sensitive personal information of in-home caregivers for vulnerable populations is exempt from inspection and copying under [the PRA]." By their terms, these provisions deny access to Provider Information irrespective of a requester's views, ideology, or message on any particular subject. The implication of Appellants' argument is that they could adopt a different viewpoint regarding collective bargaining in order to obtain Provider Information. But this is not so. Under the plain language of sections 42.56.640 and 43.17.410, pro-collective-bargaining voices and anti-collective-bargaining voices (and all voices, for that matter) are denied access to Provider Information unless the information is requested under one of several narrow circumstances. Therefore, Appellants' argument that sections 42.56.640 and 43.17.410 condition access to Provider Information on the views of the requester is simply unfounded.

Nevertheless, Appellants contend further that the statutory provisions codifying Initiative 1501 discriminate among viewpoints, because they permit disclosure of Provider Information to the Unions (who convey a certain message on the subject of collective bargaining), while denying equal access to Appellants (who convey a competing message). We disagree. "A regulation engages in viewpoint discrimination when it regulates speech *based on* the specific motivating

ideology or perspective of the speaker." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017) (emphasis added) (internal quotation marks omitted) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015)); *see also Reed*, 576 U.S. at 163 ("Government regulation of speech is content based if a law applies to particular speech *because of* the topic discussed or the idea or message expressed." (emphasis added)). In other words, the government engages in viewpoint discrimination when it "*targets . . . particular views* taken by speakers on a subject." *Ctr. for Bio-Ethical Reform, Inc. v. City and County of Honolulu*, 455 F.3d 910, 921 (9th Cir. 2006) (emphasis added) (internal quotation marks omitted) (quoting *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1223 (9th Cir. 2003)). However, the challenged provisions do not "draw[] distinctions *based on* the message[s]" conveyed by either Appellants or the Unions. *See Reed*, 576 U.S. at 163 (emphasis added). Under Revised Code of Washington section 42.56.645(1)(d), the Unions receive access to Provider Information, because "[t]he information is being provided to a representative certified or recognized under [section] 41.56.080." This provision does not permit the Unions access to Provider Information based on the *views* they espouse on the subject of collective bargaining. Rather, the Unions' current access to Provider Information is based entirely on their *legal status* as certified exclusive bargaining representatives under Washington law. *See* Wash. Rev. Code. § 41.56.080.[7]

---

[7] The Supreme Court in *Janus* acknowledged that a union's ability to "obtain[] information about employees" was one of the many "benefits" and "special privileges" of being the exclusive bargaining representative of a collective bargaining unit. 138 S. Ct. at 2467.

The Supreme Court's decision in *Perry Education Ass'n* underscores this distinction. In *Perry Education Ass'n*, a collective-bargaining agreement between a school district and the teachers' exclusive bargaining representative provided the representative with exclusive access to the school district's "interschool mail system and teacher mailboxes." 460 U.S. at 39–41. A rival teachers union, who was denied access to the mail system and mailboxes, challenged the access policy under the First Amendment. *Id.* at 41. The Supreme Court upheld the policy, finding it to be a reasonable regulation of speech in a nonpublic forum, because of "the special responsibilities" associated with being the exclusive bargaining representative for the school district's teachers. *Id.* at 50–55. In doing so, the Court rejected the contention that the access policy "favor[ed] a particular viewpoint, that of the [exclusive bargaining representative], on labor relations." *Id.* at 48–49. But there was "no indication that the school board intended to discourage one viewpoint and advance another," and the Court thought it "more accurate to characterize the access policy as based on the *status* of the respective unions rather than their views." *Id.* at 49.[8]

---

[8] Our dissenting colleague suggests "four main reasons" that "*Perry* does not save Initiative 1501." Dissent at 75–79. However, none of the four undermine *Perry*. First, the dissent fails to explain why it matters that *Perry* "concerned access to physical government property, not access to government-held information." *See id.* at 75–76. Just as the state in *Perry* had "the right to make distinctions in access on the basis of subject matter and speaker identity," *id.* at 75 (quoting *Perry*, 460 U.S. at 49), the State in this case is free to subsidize "some speech without supporting other speech" as long as "the award of the subsidy is not based on an illegitimate criterion such as viewpoint." *United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring). Thus, it does not matter that the Court in *Perry* was dealing with a "nonpublic forum" and the "different considerations" accompanying that context rather than a government subsidy of speech like that at issue here. The bottom line: the State has the right to pick and

choose which speech is subsidized so long as it does not discriminate on the basis of viewpoint. *See Leathers*, 499 U.S. at 450.

As to the dissent's second point, we join the Supreme Court in refusing to find that "[Initiative 1501] is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate." *Hill v. Colorado*, 530 U.S. 703, 724 (2000); *accord Frisky v. Schultz*, 487 U.S. 474, 482 (1988) (finding that an ordinance restricting picketing was "content neutral" despite record evidence that it was enacted to suppress the activities of antiabortion protestors).

The dissent's third and fourth arguments—regarding the "reasonableness" of Initiative 1501—also miss the mark. *Perry* dealt with a government restriction on speech in a nonpublic forum. *See* 460 U.S. at 49. In that context, courts must ask two distinct questions: (1) whether the restrictions "discriminate against speech on the basis of viewpoint" and (2) whether the restrictions are "reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 743 U.S. 788, 806 (1985)); *accord Perry*, 460 U.S. at 48–54 (applying a reasonableness analysis after determining that the regulation did not constitute viewpoint discrimination); *Cornelius*, 473 U.S. at 806 ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995) ("Once it has opened a limited forum, . . . [t]he State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." (citation omitted) (quoting *Cornelius*, 473 U.S. at 806)). However, while viewpoint neutrality is "a broadly applicable requirement to *all laws* implicating First Amendment concerns with a test that does not vary," *Wisc. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 650 n.8 (7th Cir. 2013) (emphasis added), the "reasonableness" inquiry does not apply here, where we are examining the constitutionality of a speech subsidy, *see Leathers*, 499 U.S. at 450 (stating that a speech subsidy "that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas"); *see also United Reporting*, 528 U.S. at 43 (noting that as long as "the award of the subsidy

An example will demonstrate the propriety of applying *Perry Education Ass'n*'s rationale in this case. Since 2016, Thurber, Benn, and the Freedom Foundation have sought to replace SEIU 925 with PNFCCA as the exclusive bargaining representative of family child care providers. Appellants' argument that Initiative 1501 discriminates between their views and the views of the Unions begs the question: Who would receive access to Provider Information if PNFCCA became the new exclusive bargaining representative of family child care providers? The answer is quite simple under the plain terms of section 42.56.645(1)(d). First, because SEIU 925 would no longer be "a representative certified or recognized under [section] 41.56.080," it would assuredly be denied access to Provider Information (unless it sought the information under a different exception). *See* Wash. Rev. Code § 42.56.645(1)(d). Second, as the newly certified exclusive bargaining representative under section 41.56.080, PNFCCA would have unconditional access to Provider Information. *See id.* Under this scenario, the views of the two competing unions would be irrelevant, because the sole factor deciding who may lawfully access Provider Information under section 42.56.645(1)(d) is whether a requester has achieved the *legal status* of an exclusive bargaining representative under section 41.56.080.[9]  Therefore,

---

is not based on an illegitimate criterion such as viewpoint," a state "is free to support some speech without supporting other speech" (Ginsburg, J., concurring)). Therefore, the existence of reasonable alternatives plays no role in the present analysis.

[9]  The dissent argues that "[l]egal status is merely a label that the law creates," Dissent at 72 (internal quotation marks omitted), and asserts that our conclusion "that the law here distinguishes based on legal status . . . is only to ask the viewpoint discrimination question, not to answer it," *id.* at 72 (internal quotation marks omitted). However, unlike the dissent's

Appellants' argument that section 42.56.645(1)(d) currently provides the Unions with access to Provider Information based on the Unions' collective-bargaining views finds no support in the text or operation of the statute.**[10]**

---

hypothetical examples, *see id.* at 72, there is no underlying ideological test that must be met in order to receive the speech subsidy at issue in this case. Indeed, as explained above, the Provider Information is awarded based on status alone; the recipients' adherence to a given viewpoint plays no role in determining who receives it.

The dissent also argues that our approach somehow contravenes *Janus*, and would even result in that case "com[ing] out the other way." *See* Dissent at 72–74. This is plainly incorrect. We do not dispute the Supreme Court's holding in *Janus* that union speech "in the context of collective bargaining is of great public importance." 138 S. Ct. at 2475. However, the mere fact that "[u]nions *have* views on topics of public concern," Dissent at 73, does not transform Initiative 1501 into a viewpoint-based regulation on speech. At bottom, the speech subsidies at issue in this case are awarded based on status, without regard for adherence to a specific viewpoint.

**[10]** The dissent disagrees with our assessment, arguing that Initiative 1501 does discriminate on the basis of viewpoint because all unions "have an obvious, intrinsic view on whether unions should be disempowered: they understandably disagree with that position. Unions are, in other words, '*pro-union*.'" Dissent at 67. Similarly, the dissent asserts that Initiative 1501 discriminates in favor of those in power: "[i]ncumbents seek to promote incumb*ency*; those in power wish to retain it." *Id.* at 69–69; *accord id.* at 67 (stating that Initiative 1501's "speaker-based distinction powerfully favors *those views inherent to incumbent unions* while creating obstacles to speech for anyone with opposing views"). On these bases, the dissent concludes that Initiative 1501 "necessarily promot[es] the view that the incumbent Unions should stay in power." *Id.* at 69–70. However, it does not matter to our analysis whether a speech subsidy happens to affect one particular viewpoint more than another. Indeed, by the dissent's logic, every selective speech subsidy could be struck down for viewpoint discrimination. *See Wisc. Educ. Ass'n Council*, 705 F.3d at 648–49 (noting that this argument cannot be squared with the

We also reject Appellants' suggestion that these challenged provisions are viewpoint discriminatory simply because they disadvantage Appellants' message. "A facially neutral statute . . . [with] a legitimate end is not discriminatory simply because it *affects* some groups more than others." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 900 (9th Cir. 2018); *see also Wisc. Educ. Ass'n Council*, 705 F.3d at 650 ("That the benefits of [a] subsidy may fall more heavily on groups with one particular viewpoint does not transform a facially neutral statute into a discriminatory one."). Instead, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 695 (2010) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) ("[T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based."). As we already explained, "a law affecting entities holding a particular viewpoint is not viewpoint discriminatory unless it targets those entities *because of* their viewpoint." *Interpipe Contracting*, 898 F.3d at 900; *see also First Resort*, 860 F.3d

---

Supreme Court's analysis in *Regan* and "proves too much: if different speakers necessarily espouse different viewpoints, then any selective [speech subsidy] decision would violate the First Amendment as viewpoint discriminatory"). The relevant question is simply whether Initiative 1501 "regulates speech *based on* the specific motivating ideology or perspective of the speaker." *First Resort*, 860 F.3d at 1277 (emphasis added) (internal quotation marks omitted) (quoting *Reed*, 576 U.S. at 168). As explained above, Initiative 1501 does not tie access to the State-held records to any particular viewpoint or ideology. Therefore, that the Unions happen to hold certain viewpoints and also happen to receive the benefit of this subsidy is irrelevant.

at 1277–78 (finding a regulation viewpoint-neutral, even though it applied only to entities holding a certain viewpoint, because it did not regulate those entities "based on" those views). Thus, the mere fact that the challenged provisions "disproportionately impact" Appellants' message "does not transform [their] facially neutral language into an invidiously discriminatory" regulation of government-controlled information. *Wisc. Educ. Ass'n Council*, 705 F.3d at 651.[11]

In sum, Initiative 1501 did not impose viewpoint-based conditions on the disclosure of Provider Information, nor did

---

[11] Appellants also rely on *Meyer v. Grant*, 486 U.S. 414 (1988), to argue that Initiative 1501 violated the First Amendment because it "restrict[ed] access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *See id.* at 424. But *Meyer* is inapposite to this case. In *Meyer*, a Colorado statute prohibited proponents of an initiative from paying petition circulators to help obtain the necessary signatures to meet the requirements to place the initiative on the ballot. *Id.* at 416–17. The Supreme Court found that the statute restricted the initiative proponents' political expression by restricting an otherwise available method of communication. *Id.* at 422–23. However, Initiative 1501 did not similarly restrict the means by which Appellants may communicate their message. As the district court found, Appellants "may canvass, hire paid canvassers, distribute pamphlets, make speeches, advertise and hold meetings, picket, or send mailers to distribute their speech." Initiative 1501 simply refused to subsidize Appellants' efforts to identify its targeted audience with Provider Information, to which Appellants have no entitlement. *See Houchins*, 438 U.S. at 15. The Supreme Court has already "reject[ed] the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'" *Regan*, 461 U.S. at 546 (quoting *Cammarano*, 358 U.S. at 515 (Douglas, J., concurring)). And although the nature of in-home care providers' work creates an obstacle for Appellants, a state has no duty to remove obstacles "not of its own creation." *Id.* at 549–50 (quoting *Harris v. McRae*, 448 U.S. 297, 316 (1980)).

it discriminate between the competing views of Appellants and the Unions. We reject Appellants' claim accordingly.[12]

## IV

Boardman, Thurber, and Benn ("Individual Appellants") further claim that Initiative 1501 impaired their associational rights. The First Amendment implicitly protects the freedom of expressive association, which in turn "presupposes a freedom *not* to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) (emphasis added); *accord Janus*, 138 S. Ct. at 2463 ("The right to eschew association for expressive purposes is likewise protected."). Compelled or mandatory associations are therefore "permissible only when they serve a 'compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 310 (2012) (alterations adopted) (quoting *Roberts*, 468 U.S. at 623).

In the Individual Appellants' view, they are hopelessly stuck in a compelled association with the Unions. However, the record reflects very little "association" between the parties. The Individual Appellants are not members of the Unions, nor do they pay agency fees to the Unions. The only relationship between the parties arises from the Unions'

---

[12] Appellants have waived any argument that Initiative 1501 enacted content-neutral regulations of government-controlled information that incidentally burden speech, because they failed to raise such an argument in their opening brief. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

exclusive representation of the Individual Appellants in collective bargaining.

As we recently held in *Mentele v. Inslee*, 916 F.3d 783 (9th Cir. 2019), this limited relationship does not implicate the Individual Appellants' associational rights. *Id.* at 789. In *Mentele*, two family child care providers challenged Revised Code of Washington section 41.56.028, which requires exclusive collective bargaining representation for family child care providers. *Id.* at 784–85. The plaintiffs argued "that their First Amendment right to expressive association was violated when Washington recognized SEIU [925] as the exclusive bargaining representative for all childcare providers." *Id.* at 785. Relying on the Supreme Court's decision in *Minnesota State Board of Community Colleges v. Knight*, 465 U.S. 271 (1984), we held "that Washington's authorization of an exclusive bargaining representative does not infringe [a family child care provider's] First Amendment rights." *Mentele*, 916 F.3d at 789.

In *Knight*, a Minnesota statute required the state to "meet and confer" with its professional employees on matters outside the scope of collective bargaining. 465 U.S. at 273–74. Under that statute, if professional employees in a collective bargaining unit had selected an exclusive representative for collective bargaining negotiations, that representative would also serve as their exclusive representative during the "meet and confer" process. *Id.* Several faculty members of Minnesota's community colleges (who formed a single collective bargaining unit) challenged the constitutionality of their exclusive representative's role in the "meet and confer" process. *Id.* at 278. In upholding the statute, the Supreme Court concluded that the faculty members' "freedom to associate or not to associate with

whom they please . . . ha[d] not been impaired" by requiring exclusive representation during the "meet and confer" process. *Id.* at 288–89. The faculty members were "free to form whatever advocacy groups they [would] like," and were "not required to become members" of the union who represented them in the "meet and confer" process. *Id.* at 289. Any "pressure" the faculty members may have felt to join the union in order to have a voice in the "meet and confer" process was "no different from the pressure they may [have felt] to join [the union] because of its unique status" during collective bargaining, "a status the Court . . . summarily approved." *Id.* at 289–90. Thus, the Supreme Court held that the faculty members' "associational freedom ha[d] been wholly unimpaired" by the Minnesota statute. *Id.* at 290 n.12.

In *Mentele*, we found that *Knight* had addressed and "approved the requirement that bound non-union dissenters to exclusive union representation." *Mentele*, 916 F.3d at 789. In making this finding, we rejected the argument that *Janus* overruled *Knight sub-silentio* by deciding that public-sector unions could not constitutionally compel non-union members to pay agency fees. *Id.*; *see also Janus*, 138 S. Ct. at 2486 ("States and public-sector unions may no longer extract agency fees from nonconsenting employees. . . . This procedure violates the First Amendment and cannot continue."). A plaintiff in *Mentele* had argued that we were bound by a passage in *Janus*, *see Mentele*, 916 F.3d at 789, which stated that the "require[ment] that a union serve as exclusive bargaining agent for its employees . . . [was] itself *a significant impingement on associational freedoms*," although it is an impingement that is "tolerated" in the context of collective bargaining, *Janus*, 138 S. Ct. at 2478 (emphasis added). We held that this passage was mere dictum that did not "indicat[e] that the Court intended to revise the

analytical underpinnings of *Knight* or otherwise reset the
longstanding rules governing the permissibility of mandatory
exclusive representation." *Mentele*, 916 F.3d at 789.**[13]**

In light of *Knight* and *Mentele*, the Individual Appellants'
relationship with the Unions raises no First Amendment
concerns. Nevertheless, the Individual Appellants argue that
Initiative 1501 impaired their freedom of association,
regardless of the constitutional propriety of exclusive
bargaining representation. They claim that Initiative 1501 has
effectively disabled them from removing the Unions as their
exclusive bargaining representatives by preventing the

---

**[13]** Our sister circuits who have addressed the constitutional propriety
of exclusive collective bargaining representation on behalf of in-home
care providers have similarly found that *Knight* forecloses any freedom-
of-association challenge based on this representation. *See D'Agostino v.
Baker*, 812 F.3d 240, 243–44 (1st Cir. 2016) ("Since [the] non-union
professionals [in *Knight*] . . . could claim no violation of associational
rights by an exclusive bargaining agent speaking for their entire
bargaining unit when dealing with the state even outside collective
bargaining, the same understanding of the First Amendment should govern
the position taken by the family care providers here, whose objection goes
only to bargaining representation."); *Hill v. Serv. Emps. Int'l Union*, 850
F.3d 861, 864–66 (7th Cir. 2017) (holding that *Knight* "foreclose[d]" the
argument that an Illinois statute requiring exclusive representation in
collective bargaining was "a mandatory association subject[] to heightened
scrutiny"); *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018) ("On the
merits, the homecare providers contend that [a Minnesota statute] creates
a 'mandatory agency relationship' between them and the exclusive
representative that violates their right to free association under the First
and Fourteenth Amendments. This argument, however, is foreclosed by
*Knight*."); *Jarvis v. Cuomo*, 660 F. App'x 72, 74 (2d Cir. 2016)
(unpublished) ("Plaintiffs contend that New York's recognition of
defendant . . . as the exclusive bargaining representative for their
bargaining unit violates their First Amendment rights because it compels
union association. The argument is foreclosed by [*Knight*] . . . .").

Individual Appellants from obtaining Provider Information. They allege that use of Provider Information is "the only feasible means" of building the requisite support among in-home care providers to force an election for a new exclusive bargaining representative. Without the assistance of Provider Information, the Individual Appellants argue that they will be compelled to associate with the Unions in "perpetuity."

We are unpersuaded for several reasons. First, we must start with the obvious: the Individual Appellants are not entitled to Provider Information. *See Houchins*, 438 U.S. at 15. Therefore, by denying the Individual Appellants access to this information, Initiative 1501 simply refused to subsidize their efforts to replace the Unions. This is of no constitutional concern. *See Regan*, 461 U.S. at 546 ("We again reject the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'" (quoting *Cammarano*, 358 U.S. at 515 (Douglas, J., concurring))). As we have already said, "although government may not place obstacles in the path of a person's exercise of freedom of [association], it need not remove those not of its own creation." *See Regan*, 461 U.S. at 549–50 (alterations adopted) (quoting *Harris*, 448 U.S. at 316). Second, even if we were to characterize Initiative 1501 as placing a burden on the Individual Appellants' ability to remove the Unions as exclusive bargaining representatives, we find no authority (and Appellants cite to none) supporting the proposition that the First Amendment *requires* the government to make it simple enough for a collective bargaining unit to change its exclusive representative—a relationship that does not itself impair associational rights. *See Mentele*, 916 F.3d at 789. And third, the Individual Appellants rely largely on dictum from *Janus* that exclusive bargaining representation is "a significant impingement on associational freedoms that

would not be tolerated in other contexts." 138 S. Ct. at 2478. As we found in *Mentele*, this passage does not undermine *Knight*'s conclusion that mandatory exclusive bargaining representation in no way impinges First Amendment rights. *Mentele*, 916 F.3d at 789. Thus, we conclude that Initiative 1501 did not implicate the Individual Appellants' associational freedom, which has been left "wholly unimpaired." *See Knight*, 465 U.S. at 290 n.12.

## V

We need only remark briefly on Appellants' claim that Initiative 1501 violates the First Amendment rights of other in-home care providers by denying "the providers the right to determine for themselves if they want to hear Appellants' messages," because Appellants do not have standing to assert the rights of other in-home care providers.[14]

Our jurisdiction "is limited to actual cases and controversies." *Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 848 (9th Cir. 2007) (internal quotation marks omitted) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). "One of the controlling elements in the definition of a case or controversy under Article III is standing." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (alteration adopted and internal

---

[14] After rejecting Appellants' right-to-receive-information claim on the merits, the district court noted that Appellants failed to include this claim in their complaint. Because the issue was "raised sufficiently for the trial court to rule on it," it has been properly preserved for appeal. *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016) (quoting *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992)); *see also id.* ("[W]hen a party takes a position and the district court rules on it, there is no waiver.").

quotation marks omitted) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989)). To establish standing, a plaintiff must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "In addition to these Article III requirements of injury in fact, causation, and redressibility, prudential standing concerns require that we consider, for example, . . . whether the plaintiff is asserting her own rights or the rights of third parties . . . ." *Alaska Right to Life Political Action Comm.*, 504 F.3d at 848; *see also Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) ("It is, however, a 'fundamental restriction on our authority' that 'in the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" (alteration adopted) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991))).

Appellants claim that Initiative 1501 infringed *other* in-home care providers' First Amendment right to receive information. Surely, the First Amendment "protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). However, Appellants do not "assert *their own* legal rights," but "those of third parties." *See Johnson v. Stuart*, 702 F.2d 193, 196 (9th Cir. 1983) (emphasis added). They have therefore failed to establish standing to bring this claim.

## VI

Finally, we address Appellants' claim that Initiative 1501 violated the Equal Protection Clause. "The Equal Protection Clause of the Fourteenth Amendment commands that no State

shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

"To prevail on [their] equal-protection claim, [Appellants] 'must [first] show that a class that is similarly situated has been treated disparately.'" *Roy v. Barr*, 960 F.3d 1175, 1181 (9th Cir. 2020) (quoting *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017)). "[O]ur first step is to identify the state's classification of groups." *Gallinger*, 898 F.3d at 1016 (alteration adopted and internal quotation marks omitted) (quoting *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988)). Here, Initiative 1501 exempted certified exclusive bargaining representatives from the general prohibition on access to Provider Information. *See* Wash. Rev. Code § 42.56.645(1)(d). Having "identified a classified group, we look for a control group composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy." *Gallinger*, 898 F.3d at 1016 (citations omitted). Appellants contend that they are similarly situated to the Unions (who are currently the certified exclusive bargaining representatives of in-home care providers), because "both seek to utilize updated provider lists to engage in protected speech with providers." The State contends that Appellants are in no way similarly situated to an exclusive bargaining representative who is required under Washington law to represent all members of a collective bargaining unit in collective bargaining negotiations. However, we need not resolve this dispute, because Initiative 1501 satisfies the appropriate level of

scrutiny even if Appellants were similarly situated to this classified group. *See Roy*, 960 F.3d at 1181 ("*If* the two groups are similarly situated, we determine the appropriate level of scrutiny and then apply it." (quoting *Gallinger*, 898 F.3d at 1016)).

As we have already discussed, Appellants have failed to demonstrate that Initiative 1501 has burdened their First Amendment rights. Accordingly, the initiative "need not be tested by the strict scrutiny applied when government action impinges upon a fundamental right protected by the Constitution."[15] *Perry Educ. Ass'n*, 460 U.S. at 54. Instead, Initiative 1501 "'need only rationally further a legitimate state purpose' to be valid under the Equal Protection Clause." *Knight*, 465 U.S. at 291 (quoting *Perry Educ. Ass'n*, 460 U.S. at 54); *accord Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012). Under rational-basis review, "[a] statute is presumed constitutional, and 'the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320–21 (alteration adopted and citations omitted) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "The Equal Protection Clause is satisfied so long as there is a plausible policy reason for [a] classification, . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Crawford v. Antonio B. Won Pat Int'l Airport Auth.*, 917 F.3d 1081, 1095–96 (9th Cir. 2019) 1095–96 (citations omitted) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992)). "Given the standard of review, it should come as no surprise that

---

[15] Appellants do not claim that Initiative 1501 "proceed[s] along suspect lines." *See Heller v. Doe*, 509 U.S. 312, 319 (1993).

[courts] hardly ever strike[] down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018).

The challenged provisions of Initiative 1501 satisfy rational-basis review. First, the State has a legitimate interest in protecting seniors and other vulnerable individuals—and all of its residents, for that matter—from identity theft and other financial crimes, and Washington voters "could have rationally decided" that generally prohibiting public access to the personal information of in-home care providers—many of whom work within the homes of their clients—"would further that interest." *Crawford*, 917 F.3d at 1095 (emphasis removed) (quoting *Johnson v. Rancho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1031 (9th Cir. 2010)). Second, Washington voters could have rationally decided that providing the exclusive bargaining representatives of in-home care providers with access to Provider Information would further the "legitimate state [interest] . . . in the special responsibilities of an exclusive bargaining representative." *See Perry Educ. Ass'n*, 460 U.S. at 54.[16]

---

[16] Appellants argue that Initiative 1501 has no rational basis for prohibiting public access to the personal information of family child care providers in particular, because these providers do not care for "vulnerable individuals" (as they are defined under Initiative 1501). However, this argument was not presented to the district court. Because Appellants "fail[] to address any of the exceptions to the general rule that an argument raised for the first time on appeal is waived," we decline to address their belated argument. *See Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142, 1153 (9th Cir. 2020)). "The district court is not merely a way station through which parties pass by arguing one issue while holding back . . . others for appeal." *Crawford v. Lungren*, 96 F.3d 380, 389 n.6 (9th Cir. 1996).

Nevertheless, Appellants argue that Initiative 1501 fails rational-basis review, because it was motivated by animus towards Appellants and their opposition to the Unions. Certainly, "a bare desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest" under the Equal Protection Clause. *Romer v. Evans*, 517 U.S. 620, 634 (1996) (alterations adopted) (quoting *U.S. Dep't of Ag. v. Moreno* (*Moreno*), 413 U.S. 528, 534 (1973)); *accord City of Cleburne*, 473 U.S. at 446–47. But where the affected parties are not members of a "traditionally suspect class" (i.e., classes defined by race or national origin), we "may strike down" a challenged law on the basis of animus only "if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment.'" *Animal Legal Def. Fund v. Wasden* (*Wasden*), 878 F.3d 1184, 1200 (9th Cir. 2018) (quoting *Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 598 (9th Cir. 1990)); *accord Gallinger*, 898 F.3d at 1021. We have already found that Initiative 1501 serves legitimate state interests. That "conclusion, on its own, prevents [Appellants] from succeeding on their Equal Protection claim." *Gallinger*, 898 F.3d at 1021; *see also Wasden*, 878 F.3d at 1200 (upholding a state statute under the Equal Protection Clause, because, although it was motivated by animus, it served a legitimate state interest, and therefore did "not rest exclusively on an 'irrational prejudice'" (quoting *City of Cleburne*, 473 U.S. at 450)).

That being said, we further reject Appellants' contention that Initiative 1501 was motivated by animus. A plaintiff demonstrates animus by showing "that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (quoting

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). "Possible evidence includes disparate impact on a particular group, 'departures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" *Id.* (quoting *Arlington Heights*, 429 U.S. at 266–68). As evidence that Initiative 1501 was motivated by animus, Appellants present *the Unions'* motivations in supporting the ballot measure. However, there is no evidence in the record (and Appellants certainly cite to none) indicating that *the more than 2.2 million Washington voters* who voted in favor of Initiative 1501 were motivated by "an irrational prejudice," *see City of Cleburne*, 473 U.S. at 450, or "a bare desire to harm" Appellants or their message against the Unions, *see Romer*, 517 U.S. at 634 (alteration adopted) (quoting *Moreno*, 413 U.S. at 534). We refuse to impute upon Washington voters the allegedly invidious motivations of the Unions. Appellants' claim of animus is therefore unfounded.

**AFFIRMED**

---

BRESS, Circuit Judge, dissenting:

What if the State of Washington passed a law that gave the reigning political party access to certain State-controlled, speech-enabling information, but denied that information to everyone else? It is hard to imagine anyone believing such a law would be constitutional under the First Amendment. So should it matter if the State enacted the same law, but instead of giving the information to the incumbent political party, it gave it to an incumbent public-sector union that serves as the exclusive bargaining representative for certain employees

paid with public funds?  That is what happened here when Washington voters enacted I-1501.  This ballot initiative gave the incumbent unions access to critical identifying information for difficult-to-locate State-paid home care workers, but disallowed anyone else from obtaining it through a public records request—including an organization that sought the information to contact these State employees and inform them they had a constitutional right not to pay union dues.  *See Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018); *Harris v. Quinn*, 134 S. Ct. 2618 (2014).

The text and operation of I-1501 and a troubling documentary record demonstrate exactly what is going on here: transparent viewpoint discrimination.  The State is effectively using an information embargo to promote the inherently "pro-union" views of the incumbent unions, while making it vastly more difficult for those with opposing views—and particularly those with views opposite unions—to reach their intended audience.  The First Amendment does not permit this.  There are competing perspectives in this country about the role and efficacy of public-sector unions.  And in Washington State, there are divergent views as to whether the incumbent unions are best serving the in-home care providers they represent.  I-1501 gives government-held information to persons on only one side of these important debates—the incumbent unions themselves—while denying that information to everyone on the other side.  Persons who oppose public-sector unions cannot get the information, nor can persons who wish to replace the incumbent unions with a rival union.  The State-held information here is not otherwise available.  And the information at issue is critical: the very means by which each side can feasibly locate the in-home care providers with whom they wish to engage in core political speech about

topics of vital concern—including whether public-sector employees should stop paying union fees.

We should have recognized I-1501 for what it is: a powerful deterrent to the open discourse of ideas that is the hallmark of a free people. The First Amendment requires that winners and losers in political debates win or lose on their own accord, without government favoritism. Here, the whole point of I-1501 was to block opposition to public-sector unions, entrench the incumbent unions, and prevent the exercise of First Amendment rights that *Harris* and *Janus* validated. That the State's effort has seemingly worked only confirms the unacceptable viewpoint discrimination that is afoot. The State cannot accomplish through a viewpoint-discriminatory disclosure of government-controlled information what it could never achieve through a direct restriction on speech. And when the government stacks the decks in a political debate through grossly uneven access to information, courts should recognize that the free marketplace of ideas has been unacceptably compromised.

Whatever informational advantage Washington could properly give an incumbent union over others, Washington's extreme approach for in-home care providers reflects impermissible viewpoint discrimination. I would have held that I-1501 fails First Amendment scrutiny. I respectfully dissent.

I

A

I-1501 is a response to recent Supreme Court decisions recognizing the First Amendment rights of public-sector

employees.  To understand how and why I-1501 came about and the viewpoint discrimination that was its objective, it is first necessary to understand underlying developments in First Amendment law.

In *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), the Supreme Court had held that public-sector employees who decline to join a public-sector union could, consistent with the First Amendment, be required to pay "agency fees" for that portion of union dues used for union activities "germane to [the union's] duties as [a] collective bargaining representative." *Id.* at 235.  The justifications for allowing these fees to be charged to objecting employees were the promotion of "labor peace" and "the risk of 'free riders.'"  *Id.* at 224.

Over time, *Abood* was criticized for requiring public-sector employees to subsidize union activities with which they disagreed, in asserted violation of the First Amendment's prohibition on compelled speech.  *See, e.g.*, *Knox v. SEIU, Local 1000*, 567 U.S. 298, 311 (2012).  In *Harris v. Quinn*, 134 S. Ct. 2618 (2014), the Supreme Court considered whether state-paid home healthcare workers in Illinois could be required to pay union agency fees.  These persons were not "full-fledged public employees" but were only "deemed to be public employees solely for the purpose of unionization and the collection of an agency fee."  *Id.* at 2627–28.

*Harris* explained at length how *Abood* rested on "questionable foundations."  *Id.* at 2638.  But rather than overrule *Abood*, *Harris* held that *Abood*'s rationale did not extend to the quasi-public employees at issue.  *Id.* Unconstrained by *Abood*, the Supreme Court concluded that

Illinois's requirement that state-funded home healthcare workers pay agency fees violated the First Amendment. *Id.* 2639–44. Such a requirement, the Court held, ran afoul of the "bedrock principle" that "no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Id.* at 2644.

Several years later, in *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018), the Supreme Court overruled *Abood*. The Court explained that "*Abood* was poorly reasoned" and failed to account for the "[f]undamental free speech rights [that] are at stake." *Id.* at 2460. And in a point that has special relevance to this case for reasons I will explain, the Supreme Court squarely rejected the theory that the "union speech paid for by agency fees" concerns only "private" matters and not ones of "public concern." *Id.* at 2474. Instead, *Janus* held that union speech in collective bargaining is "overwhelmingly of substantial public concern" because unions speak out on a range of important political topics, and the wages and benefits of public employees are themselves a matter of "great public concern." *Id.* at 2475, 2477. It therefore "violate[d] the free speech of nonmembers [to] compel[] them to subsidize private speech on matters of substantial public concern." *Id.* at 2460.

B

In Washington, there are two types of in-home care providers: individual providers, who care for disabled adults, and family child care providers, who provide child care for low-income families. Wash. Rev. Code §§ 41.56.030(7), 74.39A.240(3) (Supp. 2020). Although hired by private individuals and families, these care providers receive compensation through government-funded programs. *See id.*

Washington's in-home care providers are thus equivalent to the workers in *Harris*: they are treated as public employees only for purposes of collective bargaining. *Id.* §§ 41.56.028(1), 74.39A.270(1) (2013 & Supp. 2020); *see also Harris*, 134 S. Ct. at 2635. Washington's Department of Early Learning ("DEL") (now the Department of Children, Youth, and Families ("DCYF")) and Department of Social and Health Services ("DSHS") administer the State's programs for family child care providers and individual providers.

Uniquely relevant to this case, effectively communicating with care providers is essentially impossible without certain State-held information. Unlike typical public-sector employees, Washington's approximately 45,000 care providers are geographically dispersed throughout the State and are hard to identify. Most of them do not work in what we would regard as typical workplaces, as they are often one family member caring for another in the privacy of their homes. They could be our neighbors, but we would have little reason to know they were quasi-public employees. Care providers do not gather in any centralized location or typically share clients, supervisors, or any other contacts with one another. Care providers also experience a high turnover rate of 20% to 40% each year, so contact information quickly becomes outdated. By statute, Washington care providers are subject to statewide collective bargaining representation and are required to be represented by one exclusive bargaining representative. Wash. Rev. Code §§ 41.56.026, 41.56.028(1), (2)(a), (b), 74.39A.270(2)(a) (2012 & Supp. 2020). Currently, Service Employees International Union Local 775NW ("SEIU 775") is the exclusive bargaining representative for individual providers, while Service Employees International Union Local 925 ("SEIU 925") is

the exclusive bargaining representative for family child care providers. I will refer to these incumbent unions collectively as "the Unions."

If one wants to communicate with Washington's in-home care providers, it is first necessary to identify them. This task is extremely difficult without information that the State maintains. Specifically, DCYF and DSHS maintain lists of the identities and contact information for in-home care providers. The Unions use these lists regularly to communicate with care providers through direct mail, email, and door-to-door canvassing. The content of the Unions' communications bears out the Supreme Court's understanding in *Janus* that public-sector unions engage in speech on topics of public concern.

In their written communications to Washington's care providers, the Unions have urged care providers to vote on certain measures related to their employment, such as ballot initiatives concerning minimum wage and sick leave. But the Unions have also encouraged care providers to vote for certain candidates for public office, including United States Senator and Governor of Washington. For example, the Unions urged in-home care providers to vote for Governor Jay Inslee because, among other things, he "led the way to implement the Affordable Care Act and expand Medicaid coverage." The Unions in communications to care providers have advocated other policy positions that are seemingly less related to collective bargaining. This includes recommending that care providers vote in favor of gun control measures and against a proposal that the Unions described as "giv[ing] huge tax breaks to corporations." My point is not to comment on any position the Unions may wish to take, but to emphasize that the Unions are communicating with care providers about

matters of substantial public concern—*i.e.*, core political speech.

Before the passage of I-1501, other persons also relied on the State-maintained lists, obtained through public record requests, to communicate with in-home care providers. Appellant Freedom Foundation is a non-profit organization that, by its description, "seeks to advance individual liberty, free enterprise, and limited, accountable government." After the Supreme Court decided *Harris*, the Foundation created an initiative to inform in-home care providers that they were not required to pay agency fees. The Foundation claims that "[p]roviders are often grateful to the Foundation because they were previously unaware they were unionized, unaware of their rights, and had unwittingly paid hundreds of dollars to the Unions each year." The Foundation used the lists obtained through public records requests to identify and communicate with care providers.

Appellant Bradley Boardman is an individual provider who cares for his disabled sister-in-law. Once a member of SEIU 775, Boardman left the union due to its "heavy involvement in partisan politics." After *Harris*, he exercised his right to stop paying union fees and authored a letter to other individual providers explaining how they could do the same. Appellants Sharon Benn and Deborah Thurber are family child care providers. They stopped paying union fees to SEIU 925 after *Harris* and now seek to replace the union with a different union by triggering an election, which requires signatures from 30% of their fellow bargaining unit members. Wash. Rev. Code § 41.56.070 (Supp. 2020); Wash. Admin. Code § 391-25-110(1) (2009). Benn and Thurber disagree with how SEIU 925 has represented its constituents. Thurber explains that SEIU 925 "has not

adequately represented the interests of Childcare Providers." She wants a new union installed that "would be fully voluntary, fight for higher wages and insurance benefits, and oppose unreasonable regulations." Both Benn and Thurber used public records requests to obtain contact information for their fellow child care providers and send them information about their policy positions.

In 2014, the Freedom Foundation submitted a records request to DEL and obtained identifying information for care providers that the Foundation then used to contact them. The Foundation asserts that its efforts to educate in-home care providers about the Supreme Court's decision in *Harris* led to a dramatic drop in union membership. As of January 2017, 63.2% of family child care providers are reported to have left SEIU 925 post-*Harris*. As of April 2018, that number reportedly had climbed to 65.5%.

Alarmed at these developments, the Unions quickly moved to block them. Between 2014 and 2016, the Unions repeatedly sued the Freedom Foundation, Boardman, and Benn to prevent the release of the information. These lawsuits for the most part failed or were dismissed, although at least in some instances, the care provider lists were outdated by the time Appellants finally received them.

C

With Appellants gaining traction in the courts, the Unions lobbied the Washington legislature to make amendments to the Public Records Act. When those efforts did not pan out, the Unions turned to Washington's ballot initiative process. SEIU 775's Secretary-Treasurer, Adam Glickman, founded and chaired a political action committee called "Campaign to

Prevent Fraud and Protect Seniors." The Unions formed the Campaign to advocate for I-1501's inclusion on Washington's 2016 ballot. Virtually all the funding for the ballot initiative (more than $2 million) came from the Unions.

As relevant here, I-1501 amends Washington's Public Records Act to bar the release of care providers' "sensitive personal information." Wash. Rev. Code § 43.17.410(1) (2018). "Sensitive personal information" includes care providers' names, addresses, and "other personally identifying information." *Id.* § 42.56.640(2)(b). Importantly, the incumbent Unions were specifically exempted from these restrictions: the State can provide this information "to a representative certified or recognized under RCW 41.56.080," *id.* § 42.56.645(1)(d), a reference to the "[t]he bargaining representative which has been determined to represent a majority of the employees in a bargaining unit," *id.* § 41.56.080 (Supp. 2020). Here, those bargaining representatives are SEIU 775 and SEIU 925.[1]

---

[1] State agencies and State contracting parties may also obtain care providers' "sensitive personal information." *See* Wash. Rev. Code § 42.56.645(1)(a), (f), (g) (2018). Other provisions allow targeted disclosures for information about individual in-home care providers, in some cases providers whose identities the requestor would already know. *See, e.g.*, *id.* § 42.56.645(1)(b) (permitting disclosure of information concerning "individuals who have been accused of or disciplined for abuse, neglect, exploitation, abandonment, or other acts involving the victimization of individuals or other professional misconduct"); *id.* § 42.56.645(1)(c) (permitting disclosure when "[t]he information is being released as part of a judicial or quasi-judicial proceeding and subject to a court's order protecting the confidentiality of the information and allowing it to be used solely in that proceeding"). There is no suggestion that these various provisions solve the constitutional problem here, and they do not.

I-1501 was ostensibly based on protecting in-home care providers and the persons for whom they care from identity theft and fraud. The "Argument For" I-1501 in Washington's 2016 "Voter's Guide" urged passage of I-1501 to prevent "criminals" from "steal[ing] an identity, causing emotional distress, devastating personal finances[,] and ruining credit." As the district court in this case acknowledged, the "evidence" supporting these claimed harms is "thin." Indeed, the district court went on, one could instead "rationally infer that the predominate motivating factor for the Initiative and the Campaign's support for the Initiative was animus toward the Freedom Foundation and outside entities with prerogatives similar to the Foundation." As the district court explained, Appellants' "most compelling argument may be that the true, or at least primary motivation of the Initiative's drafters and promoters was to restrict the Foundation's ability to communicate with caregivers about their right to withhold financial support from the unions."

Extensive record evidence supports the district court's observations:

- Literature from the Campaign promoting I-1501 stated that "[g]roups like the Freedom Foundation are threatening unions. They tell us to stop paying dues—but that would weaken our unions and rollback what we've won, like raises, health care, retirement, and paid time off. Initiative 1501 will keep groups like the Freedom Foundation from getting our personal information. Vote yes on I-1501 to keep our unions strong and protect what we've fought for."

- A mass letter to SEIU 775 members ostensibly from another member, but on SEIU letterhead, warned that

"[t]he Freedom Foundation is at it again" and is "bent on tearing down everything we've won." It criticized the Freedom Foundation's "anti-union agenda" and the Foundation's efforts to "weaken[] the union we've worked so hard to build." The letter warned members that with the Union's then-recent litigation losses over the State-held lists, the Foundation may start contacting them again, but that care providers should tell the Foundation "NO WAY am I leaving the union that's done so much for caregivers." The letter concluded: "There's one more way you can fight to stop the Freedom Foundation: When you get your ballot in the mail, vote YES on I-1501, which protects the private information of caregivers and our state's most vulnerable."

- In correspondence to a Seattle newspaper, Adam Glickman, the Campaign's chairman, argued in favor of I-1501 because it would prevent care providers' information from being "made available to the Freedom Foundation or any other advocacy/political/religious group with an agenda."

The Unions expressly urged their members to vote for I-1501 because it would shut down the Foundation's advocacy. One SEIU 775 email to members explained that "[b]y voting Yes [on I-1501] we protect caregivers in our union from anti-union bullying of the Freedom Foundation." Another Union communication to members stated: "Groups like the Freedom Foundation are threatening our union. They tell us to stop paying dues—but that would weaken our union . . . . A vote for I-1501 is a vote to protect our union, ourselves and our clients." Fuse Vote, an advocacy organization supported by the Unions, likewise urged passage of I-1501 to end the

Foundation's advocacy efforts. It warned that the "right-wing" Foundation had "been working to acquire the names and contact information of home health care workers and child care providers as part of a deceptive campaign to destroy the unions, and this initiative would prevent them from acquiring that private personal data from the state."

Several internal communications to the office of Governor Inslee produced in discovery in this case also indicated that I-1501's intended objective was to hinder anti-union advocacy. One internal communication from the Governor's General Counsel to other staff in the Governor's office explained that "[I-1501] ostensibly deals with ID theft, but is aimed at preventing the state from releasing public records." Another internal email from the Governor's office reveals that SEIU 775 provided the Governor's office with draft remarks to deliver at an SEIU 775 town hall in support of I-1501. These draft remarks urged the Governor to say that "[w]hat the Freedom Foundation is doing is wrong," that "the Freedom Foundation is just spreading lies and garbage about your union," and that the Governor would "work to make sure that groups like the Freedom Foundation do not get access to lists that they are not entitled to."

This same document contains a draft script for Adam Glickman, the Campaign's chairman. In the script, after a union vice president says that members should vote for I-1501 because the Freedom Foundation "is trying to take away everything we've won," Glickman's draft remarks urge passage of I-1501 because "the Freedom Foundation has been aggressively contacting our members, trying to convince them to give up their union rights." Notably, this portion of the agenda is entitled: "1501 and the Freedom Foundation."

Several publications took notice of I-1501's evident non-privacy objective and urged voters to vote against the measure. For example, the *Seattle Times* Editorial Board cautioned,

> Don't be fooled by I-1501's pitch to close scary loopholes and block the release of records that enable identity theft. . . . Voters should be aware that I-1501 is the result of a spat between the powerful Service Employees International Union and the conservative Freedom Foundation. They are fighting over whether the [F]oundation can contact state-employed care providers to inform them that they no longer are required to pay union dues or fees to SEIU, following a U.S. Supreme Court ruling in 2014.

After I-1501 passed, SEIU 775 sent a congratulatory email to its members stating that the new law would "protect[] caregivers from the Freedom Foundation or other groups getting access to their personal information." SEIU 925 similarly sent an email to its members touting I-1501's approval, decrying "extremist groups like the anti-union Freedom Foundation."

I now turn to the legal principles that render I-1501 unconstitutional.[2]

---

[2] I agree with the majority that Appellants' First Amendment freedom of association claim fails. *See Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 288 (1984) (holding that an exclusive bargaining arrangement does not restrain members' "freedom to associate or not to associate with whom they please, including the exclusive representative").

II

The majority and I agree on how the analysis must begin: a claim that the State has discriminated in access to information based on viewpoint is a cognizable First Amendment theory. Washington's argument otherwise is seriously mistaken, and the court today properly rejects it.

Eight Justices writing separately in *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32 (1999), made clear that the First Amendment would forbid a State from conditioning access to government-held information based on viewpoint. *See id.* at 42 (Scalia, J., joined by Thomas, J., concurring); *id.* at 43 (Ginsburg, J., joined by O'Connor, Souter, and Breyer, JJ., concurring); *id.* at 46 (Stevens, J., joined by Kennedy, J., dissenting). As the Supreme Court later explained, these separate writings all "recognized that restrictions on the disclosure of government-held information can facilitate or burden the expression of potential recipients and so transgress the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 569 (2011); *see also Fusaro v. Cogan*, 930 F.3d 241, 254 (4th Cir. 2019) ("*United Reporting* provides affirmative support for a First Amendment challenge to certain types of conditions being placed on the dissemination of government information.").

---

*But see Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 814 (6th Cir. 2020) (explaining how "*Knight*'s reasoning conflicts with the reasoning in *Janus*"). Appellants also purport to bring a freestanding claim based on the alleged right of in-home care workers to receive information. My preferred holding that I-1501 reflects viewpoint discrimination would resolve that claim on its own. The critical First Amendment issue here, and the one that fits the facts, is I-1501's viewpoint-discriminatory denial of information.

It is important to see why the First Amendment permits a claim based on discriminatory access to government-controlled information. Government discrimination against speech based on viewpoint is the highest form of First Amendment offense. Viewpoint discrimination is "an egregious form of content discrimination" violating the foundational principle that "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995). A State's complete withholding of information would not present this issue, because there is no general "First Amendment guarantee of a right of access to all sources of information within government control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) (plurality opinion). Washington thus was free not to make care provider information available to anyone. *United Reporting*, 528 U.S. at 40 (citing *Houchins*, 438 U.S. at 14).

But the government's *selective* disclosure of information is different. Information facilitates speech. *Sorrell*, 564 U.S. at 569. Not having information can burden speech or effectively restrict it altogether. *Id.*; *United Reporting*, 528 U.S. at 42 (Scalia, J., concurring); *id.* at 47–48 (Stevens, J., dissenting). Because State-held information can be used to enable speech, a State cannot withhold such information on a viewpoint-discriminatory basis and thereby accomplish through a restriction on information what it could never achieve through a direct regulation of speech. *Sorrell*, 564 U.S. at 569.

Imagine, for example, that the government held certain speech-enabling information and gave it only to members of one political party. That would subsidize and promote one

party's views while muzzling the contrary views of other parties. There is no sense in which that could be constitutional. *See United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring) ("California could not, for example, release address information only to those whose political views were in line with the party in power.").

Although the majority and I agree on the availability of the First Amendment theory here, we disagree on whether I-1501 reflects viewpoint discrimination. In my view, it plainly does. This is a situation where a law "den[ying] access to persons who wish to use the information for certain speech purposes[] is in reality a restriction upon speech" that violates the First Amendment. *Id.* at 42 (Scalia, J., concurring) (emphasis omitted).

## A

To see why this is so, we need to move a few analytical pieces into place. The first is that I-1501 draws a distinction based on the speaker: it gives the incumbent Unions unique access to care provider information. The Supreme Court's "precedents are deeply skeptical of laws that 'distinguish among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)) (alteration in original omitted). The reason is that "[s]peaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Id.* (quoting *Sorrell*, 564 U.S. at 580); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content."

(quoting *Citizens United*, 558 U.S. at 340) (alteration omitted).).

I-1501 is not a direct restriction on speech. But it is a restriction on critical State-held information that in turn enables speech. *See United Reporting*, 528 U.S. at 42 (Scalia, J., concurring); *id.* at 43 (Ginsburg, J., concurring). And in this case, that speech consists of core First Amendment material—speech on vital matters of public concern, such as collective bargaining and candidates for public office. *Janus*, 138 S. Ct. at 2474–77. The risks that a speaker-based law creates for free expression are not materially different when the government engages in a selective disclosure of State-controlled information that is used for speech purposes. *Sorrell*, 564 U.S. at 569. Today's majority opinion accepts this same premise.

In this case, the nature of the speaker that is singled out—public-sector unions—is central. I will have more to say about the majority's mistaken determination that I-1501 fashions a distinction based merely on the incumbent Unions' "legal status" as exclusive bargaining representatives. But what is critical to appreciate up front is that unions both have views and espouse them. The foundation of the Supreme Court's decision in *Janus* was that "unions express views on a wide range of subjects." 138 S. Ct. at 2475. Requiring nonmembers to subsidize public-sector union speech therefore violated the First Amendment because "[c]ompelling individuals to mouth support for views they find objectionable violates th[e] cardinal constitutional command" against "forc[ing] citizens to confess by word or act their faith" in particular ideas. *Id.* at 2463 (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)) (emphasis

omitted).  That I-1501 isolates incumbent Unions for special, preferential treatment is therefore highly relevant.

The final set piece is I-1501's distinctive features.  It is a unique law in at least two key respects.  The first is that it gives the incumbent Unions the full range of State-held information about in-home care providers but prevents everyone else from obtaining that information through a public records request. Wash. Rev. Code §§ 42.56.645(1)(d), 43.17.410(1) (2018).  The "sensitive personal information" that the law protects from public disclosure (but makes available to the incumbent Unions) is the care providers' "names, addresses, GPS coordinates, telephone numbers, email addresses, social security numbers, driver's license numbers, or other personally identifying information." *Id.* § 42.56.640(2)(b).  The incumbent Unions can get *all* of this information; for purposes relevant here, no one else can get *any* of it.  Other states have enacted laws that give unions who are exclusive bargaining agents more modest informational advantages over others, as I will discuss further below.  But the parties have not identified any state with a law like Washington's, which gives the incumbent Unions a complete monopoly over the information, including the very identity of the employees.

The second unique aspect of I-1501 is that it involves quasi-public-sector employees who are very difficult to identify or locate.  This point is not disputed.  More traditional public-sector employees are not hard to find. Teachers, for example, show up to a school each day.  Police officers are based out of a precinct.  In-home care providers are quite different.  They operate in the privacy of homes, often their own.  Their labors can be of a deeply private nature.

The State's information about the identities and contact information for in-home care providers is thus the golden ticket to communicating with them—which explains the extensive litigation over the State-held lists and the expensive ballot initiative process that produced the law before us. Absent the State-held contact information, it is extremely difficult to locate the care providers, especially en masse. Indeed, the entire asserted rationale for I-1501 is to ensure the privacy of in-home care providers, and, by extension, those for whom they care. If Washington's care providers could be easily identified through other means, I-1501 and the privacy protection it supposedly confers would be pointless.

## B

With these various pieces in place, the fundamental problem with I-1501 reveals itself. It is this: through extreme favoritism as to who may receive critical and otherwise unavailable speech-enabling information about in-home care providers, I-1501's speaker-based distinction powerfully favors *those views inherent to incumbent unions* while creating significant obstacles to speech for anyone with opposing views. The information disparity that I-1501 creates in the First Amendment's political speech heartland is so severe that the inference of viewpoint discrimination is inescapable.

Whatever differing views unions may have among themselves on some issues, unions—and especially incumbent unions—have an obvious, intrinsic view on whether unions should be disempowered: they understandably disagree with that position. Unions are, in other words, "*pro-union*." The issue is one of great public significance. Some people wish to promote the activities of

public-sector unions and believe they are vitally important to American society.  Others dislike the work of public-sector unions and believe, for various reasons, that these unions do more harm than good.  The passions on both sides of this issue are well known.  I-1501 gives critical State-controlled information to powerful actors on only *one* side of this important public debate, while denying *everyone* on the other side the same information.

It does not matter to the constitutional analysis that under I-1501, other persons or groups who may *also* be "pro-union" cannot get the same State-held information as the incumbent Unions.  The reason is that by giving the information to the incumbent Unions only, I-1501 promotes only one side of an overall debate, favoring a positive view of unions while imposing a significant burden on everyone who wishes to promote an opposing perspective.  "The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."  *Matal v. Tam*, 137 S. Ct. 1744, 1757 (2017) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)) (internal quotation marks and alteration omitted).  That is what Washington is doing here, except through the discriminatory denial of the critical information that enables speech rather than through a prohibition on the core political speech that the State-held information later facilitates.  This selective release of information violates the First Amendment no less.  *Sorrell*, 564 U.S. at 569; *United Reporting*, 528 U.S. at 42 (Scalia, J., concurring); *id.* at 43 (Ginsburg, J., concurring).

That I-1501 gives total access to *incumbent* unions while denying all access to *rival* ones, like the one Benn and Thurber support, makes the viewpoint discrimination even

more conspicuous. Incumbents seek to promote incumb*ency*; those with power wish to retain it. John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 106 (1980). An incumbent union has a natural and entirely expected view on the question whether the union is properly serving the interests of the represented workers: the incumbent believes it should continue in the role. Persons seeking to promote a rival union, by contrast, strongly disagree. In this case, Benn and Thurber have various policy disagreements with an incumbent Union and would like to see it replaced. By discriminating among different unions through the sharply unequal disclosure of information vital for effective communication, the State necessarily subsidizes the incumbent Unions and, with it, those Unions' viewpoint that they should stay in power. *See, e.g.*, *NLRB v. Magnavox Co. of Tenn.*, 415 U.S. 322, 325 (1974) ("[I]t is difficult to assume that the incumbent union has no self-interest of its own to serve by perpetuating itself as the bargaining representative.").

It is, once again, no answer to say that persons who believe the incumbent Unions are doing a fine enough job *also* cannot get the State-held information under I-1501. The problem here is the same one we observed with "pro-union" and "anti-union" groups, except another level down. *See Rosenberger*, 515 U.S. at 831–32 ("[T]hat debate is not skewed so long as multiple voices are silenced is simply wrong . . . ."). In the intensely political debate about whether an incumbent union should stay in power, Washington provides valuable State-held information to one side of this debate—*represented by the incumbent Union itself*—and everyone with a different view of the incumbent Union gets nothing. By conferring on the incumbent Unions a powerful

information advantage, the State is necessarily promoting the view that the incumbent Unions should stay in power.

The majority nonetheless holds that I-1501 "den[ies] access to Provider Information irrespective of a requester's views, ideology, or message on any particular subject." That is not the right way to look at this. Given the absolute bar on public records requests, the only relevant entities who *can* obtain the information are the incumbent Unions. Wash. Rev. Code § 42.56.645(1)(d) (2018). And the only entities that *are* incumbent unions are ones who have (1) a certain "pro-union" view of unions and (2) a positive view as to whether the incumbent union should remain in power. Nobody who has an "anti-union" view can get the information. Nor can anyone who opposes the incumbent union. The viewpoint discrimination built into I-1501 is patent.

Treating I-1501 as "facially neutral," as the majority does, fails to appreciate I-1501's obvious design. The First Amendment disallows government regulation "that is in reality a facade for viewpoint-based discrimination." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985). If I-1501 had stated on its face that no in-home care provider information would be available to (1) anyone who opposed public-sector unions and (2) anyone who sought to oppose the incumbent Unions in an election, nobody would regard this as "facially neutral." *See Rosenberger*, 515 U.S. at 828–29. Washington has accomplished the same result through the expedient (or subterfuge) of granting exclusive access to critical information to the incumbent Unions, which those Unions then use to engage in core political speech with in-home care workers, including speech that promotes the Unions themselves.

What we have here is thus not "facial neutrality," but a statutory framework that promotes one set of pro-union and pro–incumbent union views over others in the First Amendment's most hallowed ground of core political speech. It is therefore too simple to maintain, as the majority does, that "the Unions happen to hold certain viewpoints and also happen to receive" certain benefits under I-1501. Nothing about I-1501 turns on mere happenstance. The powerful, built-in informational advantage given to the incumbent Unions is so extreme as to warrant the inference of impermissible viewpoint discrimination. *United Reporting*, 528 U.S. at 42 (Scalia, J., concurring); *id.* at 43 (Ginsburg, J., concurring).

The majority's repeated characterization of I-1501 as a "subsidy" thus obscures what is at stake here. I-1501 can hardly be equated with a traditional subsidy like a tax benefit. *See Regan v. Tax'n with Representation of Wash.*, 461 U.S. 540 (1983). Instead, and through the discriminatory non-disclosure of critical, speech-enabling information that is not otherwise readily available, I-1501 confers an enormous advantage to incumbent unions who necessarily hold views intrinsic to such organizations. I-1501 is much more than a mere subsidy: it is the key to the incumbent Unions' ability to communicate with in-home care providers, and the barrier that prevents anti-union groups and rival unions from doing so effectively. I-1501 is a direct limitation on (and promotion of) expression in a way that a bare financial subsidy is not. Even so, the majority agrees that a subsidy cannot be awarded "based on an illegitimate criterion such as viewpoint." *United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring) (citing *Regan*, 461 U.S. at 540). Because I-1501 operates in that manner, the majority's characterization of I-1501 as a subsidy is ultimately irrelevant.

C

The majority concludes there is no viewpoint discrimination here because, in its view, "the Unions' current access to Provider Information is based entirely on their *legal status* as certified exclusive bargaining representatives under Washington law." This is mistaken, and it is a mistake with serious First Amendment consequences.

"Legal status" is merely a label that a law creates. To know whether a distinction based on "status" reflects viewpoint discrimination, one needs to know more about the nature of the "status" and its origins. Imagine a law providing that information could only be given to the political party that had achieved the "status" of winning the election. Such a law would plainly discriminate based on viewpoint. *See United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring). The reason is that by its very nature, a speaker-based law that turned on political affiliation would have an obvious valence to viewpoint.

Take as another example a contractor who won a government project through a competitive bid process. A law that gave this contractor state-held information based on its "status" as the bid-winner might seem neutral. But what if we learned that the bid process involved consideration of the contractors' political views so that only contractors with a particular view on a political issue could secure the work? At that point, a "status" that initially seemed innocuous would raise a serious inference of viewpoint discrimination. To say that the law here distinguishes based on "legal status," as the majority does, is only to ask the viewpoint discrimination question, not to answer it.

In this case, given I-1501's distinctive features, the "status" of being an incumbent public-sector union cannot be divorced from the reality that public-sector unions' speech reflects political viewpoints, including about unions themselves. This was the basis for *Janus*'s holding that it violated the First Amendment to require nonmembers to subsidize public-sector union speech. *Janus* leaves no doubt on this point. There, the Supreme Court considered whether public-sector union speech could be analogized to speech on matters of "private concern," so that the speech public-sector workers were required to fund through agency fees was more analogous to speech that "forms part of the official duties of the union officers who engage in speech." *Janus*, 138 S. Ct. at 2474.

The Supreme Court squarely rejected this sanitized view of union speech. It held that "union speech in collective bargaining, including speech about wages and benefits," is "'a matter of great public concern.'" *Id.* (quoting *Harris*, 134 S. Ct. at 2642–43). Moreover, unions "speak out in collective bargaining on controversial subjects such as climate change, the Confederacy, sexual orientation and gender identity, evolution, and minority religions," topics that are "sensitive political topics" and "undoubtedly matters of profound value and concern to the public." *Id.* at 2476 (internal quotation marks and footnotes omitted).

Based on this conception of "what actually occurs in public-sector collective bargaining," *id.*, it cannot be maintained that a law that gives otherwise unavailable information to incumbent public-sector unions and no one else turns merely on a formal "legal status" untethered to any viewpoints. Unions *have* views on topics of public concern, which include—critically—the claimed benefits of unions

themselves and the claimed benefits of one union over another. All of this explains why, under *Janus*, an objecting nonmember cannot be compelled to fund union speech under the First Amendment. If what matters to the analysis is solely the State-created "status" of being an exclusive bargaining agent, *Janus* should have come out the other way. And if the State had enacted a direct restriction of speech premised on the incumbent Unions' State-created "status," I am hard-pressed to see how anyone would regard the law as insulated from searching First Amendment review.

For its "legal status" theory, the majority relies almost exclusively on *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983). But *Perry* is not a safe haven for I-1501's clear viewpoint discrimination. In *Perry*, a public-sector collective bargaining agreement allowed an incumbent teacher's union access to an interschool mail system and teacher mailboxes but largely denied rival unions the same access. *Id.* at 39. A rival union sued, claiming that this differential access constituted impermissible viewpoint discrimination in violation of the First Amendment. *Id.* at 48–49. The Court disagreed. It noted (among other things) that on the record before it, there was "no indication that the School Board intended to discourage one viewpoint and advance another," so that "it is more accurate to characterize the access policy as based on the *status* of the respective unions rather than their views." *Id.* at 49.

*Perry*, decided in 1983, sits uncomfortably with the Supreme Court's modern jurisprudence concerning public-sector unions. Among other things, *Perry* relied on *Abood*, concluding that the "exclusion of the rival union may reasonably be considered a means of insuring labor peace within the schools." *Perry*, 460 U.S. at 52. But *Janus*

overruled *Abood* and specifically rejected *Abood*'s "labor peace" rationale. *Janus*, 138 S. Ct. at 2466. As *Janus* explained, "*Abood* cited no evidence that the pandemonium it imagined would result if agency fees were not allowed, and it is now clear that *Abood*'s fears were unfounded." *Id.* at 2465. *Perry*'s *Abood*-based foundations are now in serious question. *Perry* of course remains binding on us, regardless of its evident tension with *Janus*. But *Perry* does not save I-1501, for four main reasons.

*First*, *Perry* presented a fundamentally different First Amendment question because it concerned access to physical government property, not access to government-held information. Central to *Perry* was the Supreme Court's determination that the school mail system and mailboxes were neither public property that is traditionally open for expressive activity nor a so-called "limited public forum"—First Amendment parlance for public property that "the State has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45–46. Because the school mail system was a "nonpublic forum," the state had "the right to make distinctions in access on the basis of subject matter and speaker identity." *Id.* at 49.

As the Supreme Court later explained, *Perry* was a case about a claimed "right of access to government property for use in speaking to potentially willing listeners." *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 282 (1984). While the State claims the mantle of *Perry* in this case, it nonetheless concedes in its briefing in this court that "[u]nlike the present case, the [*Perry*] decision primarily involved an analysis as to what extent a public school's mailbox system was a public forum," and "[a] forum analysis is not relevant here, where the issue is access to government information."

There are plainly different considerations at stake in the context of a request for access to government property that, as in *Perry*, the government does not otherwise open to everyone for expressive purposes. *Perry* was concerned with "prevent[ing] the District's schools from becoming a battlefield for inter-union squabbles." 460 U.S. at 52. One can imagine various examples of outside groups trying to gain physical access to locations where public-sector employees work, which could prove highly disruptive. There may thus be valid reasons for limiting such access to certain groups, so that it could be permissible in some circumstances to allow access to a union that is the exclusive bargaining agent but to exclude others. These reasons simply do not apply in this case, which involves a request for access to information and does not present the same burdens for the government.

*Second*, in upholding the policy limiting mail system access to the incumbent union, *Perry* repeatedly made clear that no evidence of viewpoint discrimination was to be found. This was central to the Court's result. In *Perry*, there was "no indication that the School Board intended to discourage one viewpoint and advance another." 460 U.S. at 49. Later, when responding to Justice Brennan's dissent, the Court again emphasized that "there is no indication in the record that the policy was motivated by a desire to suppress [the rival union's] views." *Id.* at 50 n.9. The same cannot be said here, given the extreme information disparity inherent in I-1501's basic design and the extensive evidence showing that an objective of I-1501—if not *the* objective—was to stop anti-union organizations from disseminating an anti-union message to care providers.

*Third*, *Perry* upheld the school mail system policy as "reasonable[]" based on "the substantial alternative channels that remain[ed] open for union-teacher communication to take place." 460 U.S. at 53. The teachers worked in school buildings, and the rival union still retained access to school "bulletin boards" and "meeting facilities" and could (with a principal's approval) "make announcements on the public address system." *Id.* at 41, 53. Critically, there was "no showing [t]here that [the rival union's] ability to communicate with teachers [was] seriously impinged by the restricted access to the internal mail system." *Id.* at 53.

This case is completely different. There are no "substantial alternative channels" to reach in-home care providers in Washington. *Id.* It is undisputed that there are approximately 45,000 care providers who work in private homes throughout the State, so that "the only meaningful and practical way to communicate with Providers is through using public records." The high turnover rate among care providers only adds to the communication problem. Unlike the teachers in *Perry* who worked in one of thirteen schools in a single Indiana township, 460 U.S. at 39, Appellants here cannot easily know where the in-home care providers work or even who they are. And if it were the case that care providers could be readily located and contacted, then the entire privacy-based rationale that supposedly justifies I-1501 would collapse.

Finally, there is one last key difference between the mailbox access restriction in *Perry* and I-1501: *Perry*'s preferential access policy did *not* apply during periods of union elections, when rival unions are vying to be the exclusive bargaining agent. *See Perry*, 460 U.S. at 41 ("[U]nder Indiana law, the preferential access of the

bargaining agent may continue only while its status as exclusive representative is insulated from challenge. While a representation contest is in progress, unions must be afforded equal access to such communication facilities.") (citation omitted); *id.* at 53 ("During election periods, [the rival union] is assured of equal access to all modes of communication."). In fact, this was one of the factors the Court cited in affirming "the reasonableness of the limitations" that Indiana law imposed. *Id.*

I-1501 once again differs considerably. At no point in the union electoral process can rival unions obtain care provider identifying information. As noted above, to trigger an election and displace the incumbent bargaining representative, a proponent must submit a representation petition supported by 30% or more of the care providers in the bargaining unit. *See* Wash. Rev. Code § 41.56.070 (Supp. 2020). Benn and Thurber explain that "[w]ithout a current list of Childcare Providers, it will be impossible for us to get 30% of Childcare Providers to sign cards signifying an interest to hold a new election." Unlike in *Perry*, I-1501 creates no window in the overall electoral process during which rival unions may gain access to care provider lists.[3]

---

[3] The majority contends that *Perry*'s reliance on the "substantial alternative channels" for union-teacher communications and the rival unions' access to the mail system during union elections reflected considerations unique to a public forum analysis. But I read *Perry* as stressing these points as part of showing overall why the Indiana law at issue was not viewpoint discriminatory. And if the majority is correct that *Perry*'s analysis on these two points was instead limited to the nonpublic fora context, that only further underscores my point that this case presents a very different First Amendment question than *Perry*.

In light of all of this, it is quite difficult to credit the majority's "example" that supposedly "demonstrate[s] the propriety" of I-1501. The majority reasons that I-1501 does not discriminate based on viewpoint because if Appellants succeed in replacing the incumbent Unions with rival unions, then those rival unions would secure the "legal status" entitling them to the care provider contact information on an exclusive basis. But what the majority overlooks is that I-1501 is designed to make it as difficult as possible for that transfer of power to ever happen.

By denying rival unions critical State-held information, Washington law ensures that incumbent Unions have easy access to the care providers who vote in union elections, while simultaneously making it extremely difficult for rival unions to have the same communications. As compared to the incumbent Unions, rival unions must compete in a Kafkaesque election process where they cannot easily identify who the voters even are or how they can be contacted. And if it were really that easy for rival unions to win an election in this rigged regime, would the incumbent Unions have spent so much time and money securing the passage of I-1501, only for it to be used against them?

I do not think the First Amendment either allows or requires us to ignore the obvious political realities of I-1501's basic design. That law's extreme incumbent advantage—and the viewpoint discrimination it necessarily reflects—cannot be regarded as a "neutral" law.

## D

The highly troubling documentary record in this case also demonstrates that the majority's narrow focus on the

incumbent Unions' "legal status" is artificial. *See Sorrell*, 564 U.S. at 563–64 (observing that "[o]n its face, Vermont's law enacts content- and speaker-based restrictions," and then noting that "[a]ny doubt . . . is dispelled by the record and by formal legislative findings"). The documentary record is not necessary to my analysis because I-1501's text and operation more than sufficiently demonstrate viewpoint discrimination. But the record evidence is certainly corroborative on that point, and it should be cause for serious concern.

I-1501 arose from warring viewpoints about the incumbent Unions. After the Freedom Foundation successfully used State-provided lists to persuade many in-home care providers to stop paying union dues in the wake of *Harris*, the Unions sued the Foundation and even Benn in her personal capacity to stop them from obtaining the information. When that failed, the Unions pursued a ballot initiative process and made public and private statements, demonstrating that the obvious motivation behind I-1501 was to silence anti-union voices and entrench in office the incumbent Unions. There is no real dispute that this plan has worked as planned, as Appellants face serious impediments in identifying in-home care providers and promoting their contrary views. For example, there is evidence in the record that as of January 2017—by which point the Unions' litigation tactics and I-1501 had successfully prevented the Foundation from obtaining up-to-date lists of individual providers—11% of individual providers had left SEIU 775. Compare this to over 60% of family child care providers leaving SEIU 925 between July 2014 and January 2017.

Government efforts to engage in viewpoint discrimination are usually better concealed. In this case, and strikingly, the viewpoint discrimination motivating I-1501 was not just

poorly hidden, it was actually touted as a principal selling point of the law. The Union-driven Campaign supporting I-1501 prepared materials explicitly urging voters to support I-1501 because "[g]roups like the Freedom Foundation are threatening unions" and "threatening our union." SEIU 775 urged its members to vote for I-1501 "to stop the Freedom Foundation" and its "anti-union agenda." For a town hall supporting I-1501, SEIU 775's draft remarks called for Washington's Governor (whose candidacy the Unions actively supported) to urge passage of I-1501 because "[w]hat the Freedom Foundation is doing is wrong." And there are many other examples of similar statements in the record. The Unions and their supporters are of course entitled to their views about the Freedom Foundation. But operationalizing those views through the coercive force of law is an affront to First Amendment ideals.

The majority's apparent response is that "there is no evidence in the record . . . indicating that *the more than 2.2 million Washington voters* who voted in favor of Initiative 1501 were motivated by an irrational prejudice." But ballot initiatives have been invalidated on First Amendment grounds, *see, e.g.*, *Cal. Democratic Party v. Jones*, 530 U.S. 567, 570, 586 (2000); *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley*, 454 U.S. 290, 292, 300 (1981); *Mont. Chamber of Com. v. Argenbright*, 226 F.3d 1049, 1052, 1058 (9th Cir. 2000), without any suggestion that courts or litigants were somehow required to probe the hearts of the millions of persons who enacted a viewpoint discriminatory law to confirm they had nefarious anti-speech intent. In any event, that I-1501 was passed as a ballot proposition is beside the point. As the Supreme Court has explained, "[i]t is irrelevant that the voters rather than a legislative body enacted [the challenged law], because the

voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control*, 454 U.S. at 295.

The issue here is decidedly not the good faith of the Washington voters who enacted I-1501. The casebooks are full of decisions rejecting under the First Amendment potentially well-meaning efforts to restrict speech that was regarded as contrary to shared values. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 396 (1992); *Texas v. Johnson*, 491 U.S. 397, 420 (1989); *Nat'l Socialist Party of Am. v. Village of Skokie*, 432 U.S. 43, 44 (1977) (per curiam). Whether Washington's voters believed in I-1501's privacy-based rationales or thought that anti-union forces should be disempowered, or both, the result is the same: I-1501, through its text and operation, discriminates based on viewpoint.

## III

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. As a result, laws reflecting viewpoint discrimination, such as I-1501, must be subject to strict scrutiny, the highest level of First Amendment review. *Reed*, 576 U.S. at 170; *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017).

To withstand strict scrutiny, I-1501 must be "narrowly tailored to serve compelling state interests," *Reed*, 576 U.S. at 163, and "the least restrictive means of achieving" those interests, *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). The burden is on the State to make this showing. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987). "If a less restrictive alternative would serve the state's

compelling interest with the same level of effectiveness, the state must use that alternative." *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1228 (9th Cir. 2019). "Furthermore, when the plaintiff offers 'a plausible, less restrictive alternative . . . , it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.'" *Id.* (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000)). "To meet this burden, the state must provide 'more than anecdote and supposition;' it must point to evidence in the legislative record or present other evidence that demonstrates why the challenged restriction, rather than a less restrictive alternative, is necessary to further its significant interests." *Id.* (quoting *Playboy Ent. Grp.*, 529 U.S. at 822).

I-1501 fails strict scrutiny. Assuming that protecting the privacy of in-home care providers and the persons they support is a compelling state interest, I-1501 is not narrowly tailored toward that objective. As an initial matter, there is scant evidence as to how restricting access to the names of in-home care providers will protect either them or the vulnerable persons for whom they care from identity theft. The State has not brought forward any evidence that previous public records requests of care providers' identities have led to identity theft. As the State Director of AARP Washington (which declined to endorse I-1501) explained, identity thieves "do not fill out public records requests to get their victims. That's not how it works." Indeed, the district court below itself noted that the evidence of identity theft "is thin," and "[t]he Initiative does not explicitly articulate how withholding caregiver identities will protect vulnerable individuals."

The State also fails to show that I-1501 is the least restrictive means for achieving its stated goals. *See Victory*

*Processing*, 937 F.3d at 1228.  Among other things, the State has not explained why, to avoid identity theft, it needs to prevent the disclosure of all identifying information of in-home care providers, as opposed to merely some of it.  The State also has not explained why it could not protect against identity theft by allowing some greater disclosure of care provider information while instituting some confidentiality restrictions surrounding its receipt.  To this point, the incumbent Unions, State agencies, and State contracting parties are given complete access to care provider information, with "the recipient agree[ing] to protect the confidentiality of the information."  Wash. Rev. Code § 42.56.645(1)(a), (d), (f)–(g) (2018).  If that protection is sufficient to protect privacy interests, including when the information is given to the incumbent Unions, it is unclear why this would not be sufficient for Appellants as well.  By failing to explain why less-restrictive alternatives "will be ineffective to achieve its goals," *Victory Processing*, 937 F.3d at 1228, the State fails to carry its burden.

Comparing I-1501 to the laws of other states confirms it is not narrowly tailored.  While some states have laws that give incumbent unions some informational advantages when it comes to the identities and contact information of the worker class, the parties have not identified a state law that is nearly as extreme as Washington's.  The State has cited laws from Illinois, Maryland, Wisconsin, and California.  But in the examples of Illinois, Maryland, and Wisconsin, and as the State here does not dispute, the statutes give incumbent unions exclusive access to public-sector workers' *contact information*, but not the workers' names, which is the whole ballgame.  *See* 5 Ill. Comp. Stat. §§ 140/7(1)(b), 315/3(n), (o), 315/6(c) (West, Westlaw through P.A. 101-651) (prohibiting disclosure of public employees' "[p]rivate

information" but requiring such information to be provided to incumbent unions); *id.* §§ 140/2(c-5), 315/6(c-5) (omitting employee names from the definition of "private information" and related non-disclosure provisions); Md. Code Ann., State Pers. & Pens. § 3-208 (West, Westlaw through legislation effective July 1, 2020) (mandating that public employees' names and contact information be disclosed to their representative unions); Md. Code Ann., Gen. Prov. § 4-331 (prohibiting public disclosure of employees' home addresses or phone numbers, but not names); Wis. Stat. Ann. § 19.36(10)(a) (West, Westlaw through 2019 Act 186) (omitting names from the list of information to which incumbent unions have exclusive access); *see also* 19 Or. Rev. Stat. §§ 192.355(3), 243.804(4)(a) (2019) (requiring public agencies to provide public employees' contact information to incumbent unions but omitting from other non-disclosure rules the names of public employees). On their face, these statutes allow rival unions and other groups to at least identify who the employees are, so that they may be located by other means.

An Illinois statutory provision referenced in *Janus* was likewise much more narrowly tailored than I-1501. In *Janus*, the Supreme Court noted that "[e]ven without agency fees, designation as the exclusive representative confers many benefits," including "obtaining information about employees." 138 S. Ct. at 2467 (citing 5 Ill. Comp. Stat. 315/6(c) (West 2016)). But the Illinois statute that *Janus* cited at the time only required public employers upon request to "furnish the exclusive bargaining representative with a complete list of the names and addresses of the public employees in the bargaining unit." 5 Ill. Comp. Stat. 315/6(c). Nothing in this statute purported to *preclude* other entities from obtaining public employees' names through

other means, such as public records requests.  And while Illinois changed its law post-*Janus* (an evident reaction to *Janus*), the new law, as noted above, on its face does not prohibit disclosure of public-sector employees' names.  *See* 5 Ill. Comp. Stat. § 315/6(c-5).**[4]**

Washington also points to California law.  But while California bars from public release both the names and the contact information of in-home care providers, it does make this information available to "any labor organization seeking representation rights."  Cal. Gov. Code Ann. § 6253.2(b) (West 2019).  That is a critical difference compared to I-1501. Washington does not dispute that under California law, Benn and Thurber's rival union could obtain the information, which they cannot do under Washington law.  In fact, under California law, rival unions can even obtain workers' cell phone numbers and personal email addresses.  *Id.*  I provide these examples from California and other states not to suggest they are necessarily immune from constitutional challenge, but to show that by comparison, Washington's law is an outlier.  Other states' laws show that Washington could have more narrowly tailored I-1501 in furthering any supposed privacy interest.

I imagine there could be laws that give incumbent unions a somewhat greater informational advantage over others, but

---

**[4]** Washington argues here that *Janus*'s reference to the Illinois provision implies that I-1501 is constitutional.  Given the significant differences between I-1501 and Illinois law (as it existed at the time of *Janus*), the State's position is not tenable.  Indeed, it is somewhat remarkable for Washington to claim that *Janus* somehow provides support for I-1501 when I-1501 reflects an obvious effort to make an end-run around *Janus* by preventing in-home care providers from knowing they have a *Harris*/*Janus* right not to pay union agency fees.

which pass constitutional muster because the more modest information disparity does not raise such an obvious inference of viewpoint discrimination. But here, I-1501 gives the incumbent Unions all the identifying information, and anti-union groups and rival unions get none of it. I-1501 thus maximizes to the greatest extent the incumbent Unions' ability to convey viewpoints inherent to incumbent unions. And it does so in the context of a population of public-sector workers who cannot be easily identified otherwise given the unique nature of their work. This whole regime is designed to promote pro-union views and stem the tide of workers leaving the unions in the wake of *Harris* and *Janus*.

In my view, these distinctive features cause I-1501 to fail First Amendment scrutiny and thereby violate Appellants' fundamental rights under the Equal Protection Clause. *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012) ("The equal protection claims rise and fall with the First Amendment claims."). Because the court does not vindicate Appellants' constitutional rights, I respectfully dissent.